Emily WATSON, Defendant Below, Appellant,

v.

DIVISION OF FAMILY SERVICES, Plaintiff Below, Appellee.

No. 18,2002.

Supreme Court of Delaware.

Submitted: Sept. 24, 2002.

Decided: Dec. 24, 2002.

13. *Id.*

Bruce A. Rogers, Georgetown, for Appellant.

James S. Reichert (argued) and Peter S. Feliceangeli, Deputy Attorneys General, Department of Justice, Georgetown, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court en Banc.

HOLLAND, Justice:

The respondent-appellant, Emily Watson[1] (the "Mother"), filed a timely notice of appeal with this Court from a final judgment of the Family Court. Pursuant to that judgment, the Family Court granted the petition of the Division of Family Services ("DFS"), petitioner-appellee, to terminate the Mother's and Father's parental rights. Only the Mother challenges that judgment.

The Mother has raised two issues on appeal. First, she contends that the decision of the Family Court to terminate her parental rights was not supported by clear and convincing evidence and was not the result of an orderly and logical deductive reasoning process. Second, the Mother submits that her due process rights under both the United States Constitution and the Delaware Constitution were violated by the failure of the Family Court to appoint an attorney to represent her when the dependency and neglect petition was filed by DFS.

In *Brown v. DFS*, this Court recently discussed the issue of appointment of counsel for indigent parents during dependency and neglect proceedings.[2] This Court, however, has never decided whether an indigent parent has a due process right to counsel at State expense in a dependency and neglect proceeding under the United States Constitution and the Delaware Constitution.[3] That issue of

1. The Court has assigned pseudonyms to the parties in this case. Supr. Ct. R. 7(d).

2. *Brown v. Div. of Family Servs.,* 803 A.2d 948 (Del.2002).

3. *Id. at* 955.

first impression must be decided in this case.

Today, we hold that the due process requirements in both the United States Constitution and the Delaware Constitution require the Family Court to determine, on a case-by-case basis, whether indigent parents have a right to be represented by counsel in a dependency and neglect proceeding. In applying that holding to the facts of this case, we have concluded that the judgment of the Family Court must be reversed. Nevertheless, the children will remain in the custody of DFS and continue to reside with their grandparents when this matter is remanded for further proceedings in accordance with this opinion.

### Facts [4]

In November 1997, DFS learned that the Mother was leaving her four children home alone at night while she went out. Shortly before this, the Mother and the Father of these children were divorced. The Father was no longer in the home. After an investigation, DFS opened a treatment case for the Mother. A number of services were offered to the Mother between November 1997 and July 28, 1998.

Even before it filed a petition for dependency and neglect on July 28, 1998, DFS workers had concerns about the Mother's mental health status based on the Mother's erratic behavior when meeting with them, as well as her prior history of psychiatric services and treatment. In November 1995, the Mother became intoxicated after arguing with the Father, barricaded herself in the home and threatened to kill herself and the children with a shotgun. She was involuntarily hospitalized at the Delaware State Hospital for 24 hours, then discharged with a referral for

out-patient drug and alcohol treatment. The year before she had been treated by a psychologist but had stopped therapy before being discharged.

During its investigation after the report in November 1997, DFS offered to arrange for a mental health evaluation for the Mother. DFS workers also had concerns about the Mother having substance abuse problems. The Mother had a prior history of abuse of alcohol and drugs as well as referrals for treatment. The Mother repeatedly refused to cooperate with any of the services suggested by DFS. Throughout this period, DFS received reports that the Mother lacked sufficient funds to buy food for herself and the children, or to pay her utilities at her residence, and that her electricity was repeatedly disconnected for nonpayment.

On July 28, 1998, DFS received a report that the Mother had been arrested on a drug-related charge. The record reflects that on July 27, 1998, the police were called when neighbors heard the Mother and the Father talking in loud voices at the residence. The Mother and the Father had a history of domestic violence, including a recent conviction for the Father. The police later determined that the electricity to the home had been disconnected due to nonpayment of the bill. In looking through the residence, the police found a crack pipe in the Mother's possession. She was charged with possession of drug paraphernalia, and subsequently pled guilty. DFS applied for and was granted emergency custody of the four children on July 28, 1998.

On August 5, 1998, a DFS caseworker offered the Mother and the Father a case plan designed to address the issues he saw in the home. Since the Mother and the

---

4. There is no substantial dispute between the parties about the material facts. The recita-

tion in this opinion relies extensively upon the brief filed on behalf of DFS.

Father had reconciled at this time, they were offered a joint case plan. Prior to the Mother signing the case plan in October, the Family Court ordered the Mother to submit to a mental health evaluation and a drug and alcohol evaluation, as scheduled by DFS, on September 15, 1998.

Both parents initially declined to sign a case plan at that time. The Mother subsequently signed the case plan on October 2, 1998. The requirements of the case plan provided for the Mother to visit the children weekly. To insure that she was sober, she agreed to submit to a breath test prior to visits. The Mother agreed to attend all doctor visits and all other appointments for the children. The Mother agreed that she would sign all necessary consents to permit DFS to provide services. The Mother agreed that she would submit to a drug and alcohol evaluation and mental health evaluation within the next thirty days. The Mother also agreed to submit to drug screenings at least two times per month. The Mother agreed to obtain and keep appropriate housing. She agreed to find and maintain steady employment and arrange for day care for the children while she was working. She agreed that she would take parenting classes, anger management classes and domestic violence classes within thirty days of signing the case plan.

At the adjudicatory hearing held in the Family Court on October 7, 1998, both parents appeared and consented to the entry of an order for custody. Based on this consent, the Family Court found that the children were dependent and entered an order of custody in favor of DFS. Although the Mother had signed a case plan, she made little progress on her case plan after this date.

The Family Court scheduled the matter for a dispositional hearing on November 4, 1998 to review the Mother's progress. Al-though thirty days had passed since the Mother signed the case plan and approximately sixty days had passed since the Family Court ordered her to submit to the mental health and substance abuse evaluations, the Mother had not completed any of the evaluations. The Mother claimed that she lacked insurance and could not afford to pay for these evaluations. The Family Court determined that this was not true, however, since DFS had advised the Mother that it would pay the costs of the evaluations. Apparently, the Mother had simply refused to cooperate. The Family Court scheduled the Mother's case for further review on February 8, 1999.

The Mother's cooperation with DFS did not improve between the November hearing and the February hearing. The Mother did not attend her scheduled evaluations, did not visit the children regularly, and did not keep her appointments with her case worker. On those occasions when she met with her case worker, she admitted to ongoing abuse of drugs and alcohol. She also reported incidences of domestic violence with the Father. The Mother later admitted that her abuse of drugs and alcohol had reached alarming levels during this time. The Mother also testified that she was drinking on a daily basis and smoking crack cocaine every week or every other week when she signed the case plan.

At the review hearing held on February 8, 1999, the Mother admitted that she had not completed her substance abuse evaluation or the mental health evaluation. She also was homeless. She admitted that she was still drinking and was still smoking crack cocaine with her husband, most recently a few weeks before the February review. The Family Court expressed its concern to the Mother about the fact that the four children had been in foster care for six months as of the date of this hear-

ing, yet she had made little or no progress on her case plan. The Family Court urged the Mother to cooperate fully with DFS. The Family Court scheduled the case for a further review on May 12, 1999.

The Mother's lack of cooperation continued until the next review hearing. A DFS caseworker scheduled the Mother for mental health and drug and alcohol evaluations but she did not attend them. She did not visit regularly with the children. A DFS caseworker stopped the Mother's visitation with the children due to her lack of cooperation. After the February hearing, the Mother moved into the home of Everett Cassidy [5] in March 1999 and began working for him on his chicken farm. They were subsequently married.

At the review hearing on May 14, 1999, the Family Court advised the Mother that her continued failure to cooperate with the services arranged by DFS would be held against her. She still had not completed her substance abuse evaluation or her mental health evaluation as of the date of the hearing. The Family Court directed DFS to schedule these evaluations one more time. If the Mother failed to attend them, the Family Court ruled that DFS would be relieved from any further obligation to reschedule them. The Family Court scheduled the case for a permanency hearing in three months to determine if some other permanency plan for the children should be ordered by the Family Court.

From the date of the May hearing until the permanency hearing, the Mother made little progress on her case plan. The case was transferred to a DFS permanency worker in June 1999. DFS had rescheduled the Mother for a third mental health evaluation on July 27, 1999 through Delaware Guidance Services. Although the

Mother was informed of the date of the appointment by letter, she did not attend. DFS also provided the Mother with the phone number for Sussex County Counseling for her drug and alcohol evaluation, and various phone numbers for providers of the parenting classes. As of June 1999, the Mother was not involved with either service.

On August 3, 1999, the Family Court held a permanency hearing. Based on the lack of progress by the Mother on her case plan, DFS recommended that reunification services end, and that DFS file a petition for termination of the Mother's and the Father's parental rights. The Family Court approved DFS's permanency plan, and directed DFS to file its petition within thirty days.

The record reflects that from the time of her initial loss of custody through the permanency hearing, the Mother was not appointed counsel nor was she able to retain private counsel. The record does not indicate the Family Court made any findings regarding whether due process required the appointment of counsel for the Mother during the initial dependency and neglect proceedings. An order appointing counsel was issued by the Family Court for the termination proceedings six months after the petition for termination was filed by DFS.

Trial on DFS's petition occurred over four days, on April 30, May 1, October 1 and November 6, 2001. Based on the evidence presented at trial, the Family Court ruled that the Mother had failed to plan for the welfare of her children. It granted DFS's petition for termination of both the Mother's and the Father's parental rights.

### *Dependency Due Process Claim*

■ The Mother contends the Family Court failed to institute appropriate safe-

---

**5.** The Court has assigned pseudonyms to the parties in this case. Supr. Ct. R. 7(d).

guards to protect her due process rights by not appointing counsel to represent her when the dependency and neglect proceeding was commenced by DFS on behalf of the State. In *Brown,* this Court reviewed the dynamic evolution of the law in both neglect and termination proceedings. In particular, we noted how the decision to terminate parental rights is directly related to a parent's conduct following commencement of a dependency and neglect proceeding.[6] A brief review of our analysis in *Brown* demonstrates why the same due process procedural safeguards that are guaranteed to indigent parents by the United States Constitution and the Delaware Constitution in a termination proceeding are also guaranteed to indigent parents in a dependency and neglect proceeding.

### Dependency Termination Continuum

When the State files a petition to terminate parental rights, it is the end stage in a continuum that usually begins with a dependency and neglect proceeding. After a dependency and neglect proceeding is commenced, if the Family Court finds that a child is dependent, custody is transferred to the State and that child is placed in foster care. The State is then obligated to reunite the family, if possible. If the efforts at reuniting the parent and child are unsuccessful, the State files a petition to terminate parental rights.

When a termination proceeding is commenced, the factual basis for terminating parental rights is found in the conduct that

occurred from the time that child was placed in foster care until the State concluded that the efforts at reunification had failed. If an attorney is only appointed to represent an indigent parent after the petition to terminate has been filed then the outcome is almost inevitable, assuming the factual allegations in the petition to terminate can be established with credible evidence. Accordingly, more than two decades ago, the United States Supreme Court noted that "informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of counsel not only in parental termination proceedings, *but also in dependency and neglect proceedings as well.*"[7]

### Representation Rights Generally

The right to have counsel appointed at State expense in any proceeding is determined by the due process requirements in the United States Constitution[8] and the Delaware Constitution.[9] This Court has consistently stated that the term "due process of law" in the Federal Constitution is a synonym for the phrase "law of the land" as used in article 7 and article 9 of the Delaware Constitution.[10] The United States Supreme Court has determined that the due process requirement in the United States Constitution is a flexible concept that calls for such procedural and substantive protections as the situation demands.[11] Accordingly, the United States Supreme Court has held that due process clause in the United States Constitution is not a

---

6. *Brown v. Div. of Family Servs.,* 803 A.2d 948, 954–55 (Del.2002).

7. *Lassiter v. Dep't Soc. Servs.,* 452 U.S. 18, 33–34, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (emphasis added).

8. U.S. Const. amend. XIV, § 1.

9. Del. Const. art I, § 9.

10. *Gannon v. State,* 704 A.2d 272, 278 (Del. 1998); *Black v. Div. of Child Support Enforcement,* 686 A.2d 164, 168 (Del.1996).

11. *Lassiter v. Dep't Soc. Servs.,* 452 U.S. 18, 31, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), citing *Gagnon v. Scarpelli,* 411 U.S. 778, 788, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

fixed concept but implicitly means "fundamental fairness" in the context of specific circumstances.[12]

In the Delaware Constitution, however, the phrase "law of the land" is connected conjunctively with the phrase "justice administered according to the very right of the cause."[13] Thus, although the flexible concept of due process is only implicit in the United States Constitution, the framers of Delaware's Constitution explicitly guaranteed fundamental fairness in the administration of justice for the citizens of Delaware, with regard to the specific context, in all causes of action.[14] In some circumstances, the textual differences between the Federal Constitution and the Delaware Constitution have naturally led to different interpretations of their corollary due process provisions.[15]

Nevertheless, with regard to an indigent person's right to have counsel appointed at State expense, this Court's construction of the Delaware Constitution's mandate for due process "in accordance with the right of the cause" has been consistent with the flexible standards of due process enunciated by the United States Supreme Court in *Mathews v. Eldridge*.[16] Those factors, commonly referred to as the *Eldridge* factors, are: (1) the private interests at stake, (2) the government's interests, and (3) the risk the procedures used will lead to an erroneous result.[17]

### Termination Representation Rights

In *Lassiter v. Department of Social Services*, the United States Supreme Court had an opportunity to weigh the *Eldridge* factors where the appellant claimed due process required the appointment of counsel for an indigent person in a termination of parental rights proceeding.[18] In *Lassiter*, that Court concluded there was a "presumption that an indigent litigant has a right to appointed counsel only when, if the loser, he may be deprived of his personal liberty."[19] In *Lassiter*, after considering the sum total of all three *Eldridge* factors against the presumption that there is no right to counsel except in cases involving a potential loss of liberty, the United States Supreme Court concluded the United States Constitution does not require the appointment of counsel in every termination of parental rights proceeding. Instead, it held that the decision to appoint counsel would be left for trial judges to determine, on a case-by-case basis.[20]

In *Lassiter*, although the United States Supreme Court left the decision whether to appoint counsel for indigent parents to individual trial judges, it noted that even two decades ago, courts generally ruled that counsel must be appointed for indigent parents in termination proceedings.[21] At the present time, forty-five states require the appointment of counsel in termi-

---

12. *Lassiter v. Dep't Soc. Servs.*, 452 U.S. at 31, 101 S.Ct. 2153 (1981).

13. Del. Const. art I, § 9.

14. Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 58–59 (2002).

15. *Lolly v. State*, 611 A.2d 956 (Del.1992); *Hammond v. State*, 569 A.2d 81 (Del.1989); *Weber v. State*, 547 A.2d 948 (Del.1988); *Deberry v. State*, 457 A.2d 744 (Del.1983).

16. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

17. *Id.*

18. *Lassiter v. Dep't Soc. Servs.*, 452 U.S. 18, 26–27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

19. *Id.* at 33–34, 101 S.Ct. 2153.

20. *Id.* at 31–32, 101 S.Ct. 2153.

21. *Id.* at 30, 101 S.Ct. 2153.

nation of parental rights proceedings.[22] Delaware remains one of the few states to continue to use the case-by-case approach.[23]

In *Carolyn S.S.*, this Court adopted the *Lassiter* presumption in construing the Delaware Constitution instead of holding that there was a fixed rule of entitlement to counsel for indigent parents in all termination proceedings.[24] Accordingly, when an indigent litigant is not confronted with a deprivation of personal liberty, the due process right to the appointment of counsel guaranteed by both the United States Constitution and the Delaware Constitution is decided on a case-by-case basis, *i.e.*, justice administered according to the right of the cause.[25] In making that determination, the Delaware Constitution and the United States Constitution require courts to look at the same three elements that are now known as the *Eldridge* factors: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions."[26] Today, Delaware judges routinely appoint counsel to represent indigent parents in termination of parental rights proceedings.

### Dependency Representation Reviewed

In 1995, Delaware was awarded a federal grant to assess and improve Delaware's child welfare system. In May 1997, this Court released the findings and recommendations that resulted from the Delaware Court Improvement Project grant. One of those final recommendations was that every indigent parent and child should have representation in child welfare proceedings from the inception of a dependency and neglect proceeding.[27]

In 1997, the United States Congress also passed the Adoption and Safe Families Act ("ASFA"). Upon its passage, the ASFA mandated that a "child's health and safety shall be the paramount concern" and that the State should be making timely permanency decisions for children.[28] The ASFA mandates that states develop a system to provide legal representation for *children* in dependency and neglect proceedings.[29] We noted in *Brown* that legal representation is provided for Delaware children who are in foster case, indirectly, by the attorneys for each CASA and, directly, by the recent statutory establishment of the Office of the Child Advocate.[30] Legal representation in a dependency and neglect pro-

---

22. Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter*, 14 Touro L.Rev. 247, 260 (1997); Joel E. Smith, Annotation, *Right of Indigent Parent to Appointed Counsel in Proceedings for Involuntary Termination of Parental Rights*, 80 A.L.R.3d 1141 (1977).

23. *Brown v. Div. of Family Servs.*, 803 A.2d 948, 957 (Del.2002).

24. *In re Carolyn S.S.*, 498 A.2d 1095, 1098 (Del.1984).

25. *Black v. Div. of Child Support Enforcement*, 686 A.2d 164, 168 (Del.1996).

26. *Lassiter v. Dep't Soc. Servs.*, 452 U.S. at 27, 101 S.Ct. 2153.

27. Court Improvement Project of the Delaware Supreme Court, *An Assessment of Delaware's Court Performance in Child Welfare Cases with Recommendations for Improvements*, 3 (1997).

28. 42 U.S.C. §§ 671(a)(15)(A), 675(5)(E) (1998).

29. *Id.*

30. The Office of the Child Advocate is an independent state agency created in June of 1999 that is charged with safeguarding the welfare of Delaware's children. Del Code Ann. title 29, §§ 9001A–9008A (Supp.2000).

ceeding is provided for the DFS at State expense by Deputy Attorneys General.

Consequently, in Delaware, at the present time, the indigent *parents* are the *only parties* to a dependency and neglect proceeding who are not provided with representation. The *Guidelines for Public Policy and State Legislation Governing Permanence for Children* ("Guidelines"), however, specifically recommend that "states guarantee that counsel represent biological parents (or legal guardians) at all court hearings, including at the preliminary protective proceeding. Such representation should be provided at government expense when the parent or guardian is indigent." [31]

### Dependency Representation Rights

■ In *Carolyn S.S.*, in the context of a termination proceeding, this Court held that Article I, Section 9 in the Delaware Constitution provides the same due process guarantees as the United States Constitution: a Delaware trial judge must decide whether to appoint counsel for indigent parents in a termination proceeding by applying the *Eldridge* factors on a case-by-case basis. [32] In this appeal, we hold that the same due process guarantee in the Delaware Constitution requires a trial judge to decide whether to appoint counsel for indigent parents in a dependency and neglect proceeding on a case-by-case basis. In *Brown*, this Court held that the due process guarantee in Article I, Section 9 of the Delaware Constitution requires that notice of the right to counsel and how to exercise that right must be given to parents when a petition is filed for the termination of parental rights. [33] In this appeal, we hold that same due process guarantee in the Delaware Constitution requires similar notice to be given to parents when a petition for dependency and neglect is filed.

The procedures that are reflected in the facts underlying this appeal are no longer followed in the Family Court. In fact, today's holding is consistent with the current practices and rules of the Family Court. [34] At the present time, the Family Court routinely appoints counsel to represent indigent parents in dependency and neglect proceedings. Although the General Assembly has not enacted a statute establishing such a right for indigent parents, it has begun to provide limited funding to the Family Court for the purpose of appointing attorneys to represent indigent parents in dependency and neglect proceedings. In the future, the General Assembly will be called upon to provide funding to the extent that the Family Court determines, probably routinely, that the due process provisions in the United States Constitution and the Delaware Constitution require the appointment of counsel to represent indigent parents when dependency and neglect proceedings are initiated by the State.

---

**31.** Donald N. Duquette & Mark Hardin, U.S. Dep't of Health & Human Services, *Guidelines for Public Policy and State Legislation Governing Permanence for Children,* VII–5 (1999). We note that, to date, the federal government has not provided the states with any funds to defray the cost of appointing counsel to represent indigent parents in dependency and neglect proceedings.

**32.** *In re Carolyn S.S.,* 498 A.2d 1095, 1098 (Del.1984).

**33.** *Brown v. Div. of Family Servs.,* 803 A.2d 948, 958 (Del.2002).

**34.** *See* Rules Applicable to all proceedings involving dependent, neglected, or abused children in the custody of the Department of Services for Children, Youth and their Families. Del.Fam. Ct. Civ. R. 206–07 (effective Dec. 1, 2002).

### Dependency Representation Analysis

The Mother contends the Family Court did not protect her due process rights when it failed to appoint counsel for her after the dependency and neglect proceedings were commenced by DFS. To determine whether the failure to appoint counsel violated the Mother's due process rights, the presumption against the right to counsel except where personal liberty is at stake must be weighed against the *Eldridge* factors.[35] In *Black*, this Court held "should one side of the analysis not clearly outweigh the other, the [trial judge] should err on the rule of appointing counsel in order to further the due process right to fundamental fairness in judicial proceedings."[36]

 To rebut the presumption against appointment of counsel, the due process clause of the United States Constitution and the Delaware Constitution require considering the sum total of the three *Eldridge* factors. Those factors are: (1) the private interest at stake, (2) the government interest, and (3) the risk of error.[37] We will consider each of them in the context of requiring the appointment of counsel in a dependency and neglect proceeding.

First, the private interests at stake in dependency/neglect proceedings are great. The parent faces the loss of temporary custody of her child that may eventually lead to permanent termination. Although the State is not yet seeking to terminate the parent's interest in his or her children, it is beginning the process. In *Lassiter*, the United States Supreme Court held that parents have a right to the "companionship, care, custody and management" of their children. That right not only requires deference but also warrants protection.[38] Thus, the private interests of the Mother that were at stake when the dependency and neglect petition was filed are compelling.

Second, the government interest when a dependency petition is filed is similar to the interest in a termination proceeding that was described in *Lassiter* by the United States Supreme Court. The State has an interest in the welfare of children and in fostering an accurate decision. The State is also subject to a federal statutory mandate for a permanency decision to be made as quickly and efficiently as possible.[39] In *Lassiter*, the United States Supreme Court ruled that, while the State's economic interest is important, it is not enough to override the great compelling interests of the parents that are at stake.[40]

Third, the accuracy of the procedures in a dependency and neglect proceeding must be examined. This Court noted in *Brown* that at the present time, indigent parents are the only parties who, from the outset of dependency and neglect proceedings, do not have appointed legal representation.[41] The indigent parents of children who have been placed in foster care are not only without economic resources but are also often dysfunctional, usually due to parental

---

**35.** *Brown v. Div. of Family Servs.*, 803 A.2d at 958.

**36.** *Black v. Div. of Child Support Enforcement*, 686 A.2d 164, 169 (Del.1996).

**37.** *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**38.** *Lassiter v. Dep't Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

**39.** 42 U.S.C. §§ 671(a)(15)(A), 675(5)(E) (1998).

**40.** *Lassiter v. Dep't Soc. Servs.*, 452 U.S. at 28, 101 S.Ct. 2153.

**41.** *Brown v. Div. of Family Servs.*, 803 A.2d at 954.

substance abuse.[42] Children cannot be safely and successfully reunited with their parents unless the conditions that led to the judicial determination of dependency and neglect are corrected permanently. Respected authorities have concluded that it is unrealistic to expect that these already challenged indigent parents will turn their lives around, especially on the accelerated ASFA time table, without an attorney to advocate their need for the reunification resources that are available through the DFS.[43]

### Representation Was Required

When the Family Court granted the dependency petition and awarded custody of the children to DFS, it ordered the Mother to be evaluated for substance abuse and mental health problems. The Mother was unemployed at the time of the initial dependency and neglect proceedings. She was still in the midst of an abusive relationship with her ex-husband. In addition, she had just been arrested and pled guilty to a drug-related charge.

At the inception of the dependency/neglect proceedings, the Mother admitted to abusing alcohol and drugs. Both DFS and the Family Court were aware of her drug and alcohol problems. DFS was also aware of the Mother's mental health problems because of her erratic behavior towards caseworkers as well as her prior psychiatric services and treatment. DFS made these facts known to the Family Court. The Mother was in no condition to effectively and intelligently defend herself against the knowledge and experience of the State. She did not have the proper state of mind to effectively voice her case due to her mental health and substance abuse problems. The Mother was indigent and could not afford a lawyer.

Without the assistance of counsel to act as an intermediary on her behalf with DFS and as her advocate in the Family Court, it was impossible for her to receive either mental health or substance abuse treatment and *a fortiori* impossible for her to make any progress in being reunited with her children. The Mother's inability to comply with the Family Court's directives, without the assistance of counsel is reflected on the record in the periodic reports to the Family Court from DFS that eventually changed the permanency plan for these children from reunification to a termination of parental rights. When counsel was finally appointed for the Mother, six months into the termination proceeding, the factual basis for that petition had been established.

The Mother asserts that her rights to due process under both the United States Constitution and the Delaware Constitution required the appointment of counsel at State expense to represent her when the dependency and neglect petition was filed, if justice was to be administered in accordance with the right of the cause. We agree. The record reflects that when the Mother appeared for the dependency hearing, the Family Court was aware that

**42.** Kathleen A. Bailie, Note, *The Other "Neglected" Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them,* 66 Fordham L.Rev. 2285, 2291–92 (1998).

**43.** *See generally,* Kathleen A. Bailie, Note, *The Other "Neglected" Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them,* 66 Fordham L.Rev. 2285, 2291–02 (1998). Raul V.

Esquivel, III, Comment, *The Ability of the Indigent to Access the Legal Process in Family Law Matters,* 1 Loy. J. Pub. Inc. L. 79 (2000). *Compare* Jennifer L. Saulino, Book Note, *NOTICE Are We Protecting the Wrong Rights?,* 99 Mich. L.Rev. 1455 (2001) (reviewing Elizabeth Bartholet, *Nobody's Children: Abuse and Neglect, Foster Drift, and the Adoption Alternative* (1999)).

she had a history of mental health problems and had been recently arrested for drug offenses as a result of continuing substance abuse. Considering the *Eldridge* factors, in the context of the Mother's condition at the time of the inception of the dependency and neglect proceedings, her due process rights under both the United States Constitution and the Delaware Constitution were violated when the Family Court did not appoint an attorney to represent her at State expense.

### Conclusion

The judgment of the Family Court that terminated the Mother's parental rights is reversed. This matter is remanded to the Family Court with directions as follows: to leave its judgment of dependency and neglect in place; to leave custody of the children with DFS; to leave the residence of the children with the respective grandparents; to appoint counsel to represent the Mother at State expense; and to direct DFS to prepare a new case plan for the Mother.