IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE GEORGE, | § | |
| | § | No. 134, 2016 |
| Appellant, | § | |
| Respondent Below, | § | |
| | § | Court Below: |
| v. | § | Family Court of the |
| | § | State of Delaware, in and for |
| DEPARTMENT OF SERVICES FOR | § | New Castle County |
| CHILDREN, YOUTH AND THEIR | § | |
| FAMILIES (DSCYF/DFS), | § | File No. 15-09-0TN |
| | § | Petition No. 15-28052 |
| Appellee, | § | |
| Petitioner Below. | § | |

Submitted: October 13, 2016
Decided: October 27, 2016

Before **STRINE**, Chief Justice, **HOLLAND** and **VALIHURA**, Justices.

## O R D E R

This 27th day of October 2016, upon consideration of the briefs of the parties and the record below, it appears to the Court that:

(1)    Pending before this Court is an appeal from the Family Court's February 22, 2016 Opinion terminating the parental rights of Stephanie George ("George")[1] to two of her children, twins M.G. and M.G. (the "Twins"), at the request of the Department of Services for Children, Youth, and their Families' Division of Family Services ("DFS").[2] In its Opinion, the Family Court also denied a guardianship petition filed by the Twins'

---

[1] The Court previously assigned pseudonyms to the parties pursuant to Supreme Court Rule 7(d).
[2] Family Court Opinion at 34-35, [*DSCYF/DFS v. George*], No. CN14-02352 (Del. Fam. Ct. Feb. 22, 2016) [hereinafter "Fam. Ct. Op. at __"], *available at* Op. Br. Ex. A.

1

paternal great aunt ("Great Aunt"). George appealed the Family Court's decision to terminate her parental rights, asserting a violation of her constitutional right to due process and claiming that the court erred in finding that she had failed to adequately plan for the Twins' needs.

(2) George is the mother of six children. She has a history with DFS dating to 2008, largely due to drug abuse and mental health issues. She previously consented to the termination of her parental rights to three of her children and to Great Aunt's permanent guardianship of a fourth. While George was pregnant with the Twins, DFS held a Team Decision Meeting ("TDM") to discuss potential caregivers for the Twins. Great Aunt attended the TDM but declined consideration as a placement resource for financial reasons. George gave birth to the Twins on April 7, 2014. The next day, the Family Court issued an *ex parte* custody order awarding emergency temporary custody to DFS and referring the case to the Court-Appointed Special Advocate (the "CASA") for appointment of a guardian *ad litem* on behalf of the Twins. Since their birth, the Twins have resided with foster parents, who are an adoptive resource.

(3) On August 12, 2014, George stipulated to the Twins' dependency, citing her inability to financially support them. On October 13, 2014, she agreed to a case plan with the goal of returning the Twins to her care (the "Case Plan"). On June 9, 2015, the Family Court granted DFS's Motion to Change Permanency Goal to Termination of Parental Rights for Purposes of Adoption, citing George's noncompliance with her Case Plan. However, the court stated that George's reunification with the Twins would remain a secondary goal. DFS filed a Petition to Terminate Parental Rights (the "TPR") on

2

September 17, 2015. Great Aunt filed a Petition for Guardianship (the "Guardianship Petition") on October 2, 2015.

(4)     On November 6, 2015, the Family Court held a hearing during which DFS, the CASA, and George presented evidence in support of and opposition to the TPR (the "Hearing"). On February 22, 2016, the court granted the TPR. Although the court stated at the Hearing that it was "not deciding" the Guardianship Petition concurrently with the TPR, the court's Opinion granting the TPR also denied the Guardianship Petition and referred to the Hearing as a "consolidated" hearing.

(5)     George raises two issues on appeal. *First*, she contends that the Family Court violated her constitutional right to due process. She alleges that the court's statement that it was "not deciding" the Guardianship Petition prevented her from presenting, or caused her to limit the presentation of, certain evidence in favor of the Guardianship Petition in an attempt to defeat the TPR. *Second*, George argues that the Family Court erred in finding that she failed to plan for the Twins' needs.

(6)     DFS and the CASA argue that George's first argument is a veiled attempt to appeal the Family Court's denial of the Guardianship Petition, and that George does not have standing to do so. In addition, they contend that the Family Court's determination that George did not adequately plan for the needs of the Twins is sufficiently supported by the record and results from an orderly and logical deductive process.

3

***The Family Court Did Not Violate George's***
***Constitutional Right to Due Process***

(7)     This Court "review[s] questions of law, including whether a party has standing, *de novo*."[3]  "Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[4]  "This Court reviews constitutional claims *de novo*."[5]  Standing is "the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance."[6]  "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[7]

(8)     George acknowledges that she lacks standing to appeal the denial of Great Aunt's Guardianship Petition.  One cannot appeal the denial of another person's guardianship petition.[8]  However, George's argument is not that the Guardianship Petition was incorrectly decided, but rather that the Family Court's statement that it would not decide the Guardianship Petition precluded George from introducing evidence

---

[3] *Office of the Comm'r, Del. Alcoholic Beverage Control v. Appeals Comm'n, Del. Alcoholic Beverage Control*, 116 A.3d 1221, 1226 (Del. 2015) (citing *Broadmeadow Inv., LLC v. Del. Health Res. Bd.*, 56 A.3d 1057, 1059 (Del. 2012)).

[4] *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[5] *Sampson v. DFS*, 868 A.2d 832, 835 (Del. 2005) (citations omitted).

[6] *Dover Historical Soc'y,* 838 A.2d at 1110 (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[7] *Id.*

[8] *See Lane v. DFS*, 2014 WL 1272264, at *1 (Del. Mar. 27, 2014) (holding that "13 *Del C.* § 2328 cannot be read to confer standing on a person, other than the petitioner, who seeks to appeal the denial of a petition for guardianship where the petitioner herself has not appealed that denial").

in favor of the Guardianship Petition that would have made the court less likely to grant the TPR. George's Amended Notice of Appeal designates the TPR Order as the order being appealed. Because the Family Court's Opinion terminated George's parental rights, it caused her injury-in-fact. Further, George's interest in maintaining a parental relationship with the Twins is within the zone of interests to be protected.[9] Therefore, George has standing to appeal the Family Court's termination of her parental rights.

(9) As for George's due process claim, we find no error. "A party is entitled to due process prior to the termination of a right protected by the Fourteenth Amendment to the United States Constitution."[10] "The United States Supreme Court and this Court have recognized, as a fundamental liberty interest, a parent's interest in maintaining a relationship with his or her child."[11] "Accordingly, both procedural and substantive[] due process must be afforded to the parties in a termination of parental rights proceeding."[12]

(10) "In a 'termination of parental rights proceeding, [this Court] analyzes . . . due process standards in accordance with the factors established by the United States Supreme Court in *Mathews v. Eldridge*.'"[13] Those factors are "first, the private interests at stake; second, the government's interests; and third, the risk that procedures used will

---

[9] *See Orville v. DFS*, 759 A.2d 595, 598 (Del. 2000) (citing *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *In re Stevens*, 652 A.2d 18, 24 (Del. 1995)) (stating that maintaining the parent-child relationship is a fundamental liberty interest).

[10] *Orville*, 759 A.2d at 597-98.

[11] *Id*. at 598 (citing *Santosky*, 455 U.S. at 753-54; *Stevens*, 652 A.2d at 24).

[12] *Id*. (citing *Santosky*, 455 U.S. at 753).

[13] *Id.* (alterations in original) (citation omitted) (quoting *In re Heller*, 669 A.2d 25, 30 (Del. 1995), *as revised* (Oct. 19, 1995)).

lead to an erroneous result."[14] "[T]he interests of the parents and the interest of government must both be balanced against the risk that the procedures used will lead to an erroneous result."[15] This Court has previously noted "that the private interest in the parent-child relationship is quite powerful[,]"[16] the interests of the government in seeking a TPR are "the welfare of children and in fostering an accurate decision[,]"[17] and the risk that "erroneous deprivation" will result from a TPR proceeding can be "considerable[.]"[18]

(11) Here, the procedures used by the Family Court during the Hearing adequately protected George from the risk of erroneous deprivation of her parental rights. Although the Family Court stated it was "not deciding on guardianship" at the Hearing, it did not limit the parties' ability to introduce relevant evidence.[19] Had George's counsel established the relevance of guardianship-related evidence, it does not appear on this record that the Family Court would have rejected it. We have considered the argument that the Family Court deprived George of a fair opportunity to oppose termination of her parental rights by its approach to handling the guardianship application in this case. However, we do not find favor with that argument because George had every incentive and opportunity to present her arguments against the termination of her parental rights at

---

[14] *Hughes v. DFS*, 836 A.2d 498, 508 (Del. 2003) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[15] *Id*. at 509.

[16] *In re Burns*, 519 A.2d 638, 646 (Del. 1986).

[17] *Hughes*, 836 A.2d at 508 (citing *Watson v. DFS*, 813 A.2d 1101, 1110 (Del. 2002)).

[18] *Burns*, 519 A.2d at 646.

[19] The Family Court permitted evidence relevant to guardianship to the extent it was also relevant to the TPR. George claims that the court "specifically shut down one of DFS's counsel's lines of questioning for veering too far into a subject relevant primarily to the guardianship petition." But even on that occasion, where Great Aunt was asked questions regarding the size of her home, the court allowed leeway. A13-14.

the hearing on the TPR motion. We note, for example, that during the TPR hearing, DFS called Great Aunt to testify. DFS was required to demonstrate that there were no willing and appropriate relatives with whom to place the Twins. It was also required to demonstrate that the TPR and adoption was the permanency goal that was in the Twins' best interests.[20] Mother was given a full and fair opportunity to cross-examine and present evidence in opposition. On this record, we find no error in the Family Court's determination, after considering the evidence and the position of the Court-Appointed Special Advocate,[21] that termination of George's parental rights was in the Twins' best interest. Because the procedure at the Hearing did not pose an undue risk of erroneous deprivation of George's parental rights, her due process rights were not violated.

### We Affirm The Family Court's Determination That George Failed To Adequately Plan For The Twins' Care

(12) "This Court's review of a Family Court decision to terminate parental rights entails consideration of the facts and the law as well as the inferences and deductions made by the Family Court."[22] Conclusions of law are reviewed *de novo*. "To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by

---

[20] *See* 13 *Del. C.* § 1103(a) (providing that parental rights may not be terminated unless "it appears to be in the child's best interest" and at least one of the statutory grounds for termination exists); 13 *Del. C.* § 722 (providing the standard for judicial assessment of a child's best interests). Both George and Great Aunt were called as witnesses by DFS.

[21] The Court Appointed Special Advocate ("CASA") was appointed to represent the best interests of the Twins on April 11, 2014, following the preliminary protective hearing where it was determined that the Twins were dependent. The CASA filed a brief on appeal in opposition to George's positions on appeal.

[22] *Robinson v. DFS*, 2015 WL 1880555, at *3 (Del. Apr. 22, 2015) (citing *Wilson v. DFS*, 988 A.2d 435, 439-40 (Del. 2010)).

the record and are not clearly wrong."[23] "If the trial judge has correctly applied the law, our review is limited to abuse of discretion."[24]

(13) "In reviewing a petition for termination of parental rights, the Family Court must employ a two-step analysis."[25] "First, the court must determine, by clear and convincing evidence, that a statutory basis exists for termination."[26] "Second, the court must determine, by clear and convincing evidence, that termination of the parental rights is in the child's best interests."[27]

(14) "Section 1103(a)(5) permits termination for failure to plan when a parent is 'not able, or [has] failed, to plan adequately for the child's physical needs or mental and emotional health and development.'"[28] "Where, as here, the statutory basis justifying termination is a failure to plan, the Family Court must also find the existence of at least one additional condition enumerated in [Section] 1103(a)(5)."[29]

(15) Here, the Family Court's determination that DFS established by clear and convincing evidence that parental rights should be terminated pursuant to 13 *Del. C.* § 1103(a)(5) is supported by the record. In its analysis, the court assessed George's progress with respect to her Case Plan. In sum, the Case Plan required that George:

> provide a safe, clean and appropriate home for [the Twins][;] maintain stable employment[;] attend all [the Twins'] medical and developmental appointments[;] attend and successfully complete a parenting course[;] have

---

[23] *Id.* (citing *Powell v. DSCYF*, 963 A.2d 724, 731 (Del. 2008)).

[24] *Id.* (citing *Powell*, 963 A.2d at 731).

[25] *Id.* (citing 13 *Del. C.* § 1103(a)).

[26] *Id.* (citing *Shepherd v. Clemens*, 752 A.2d 533, 537 (Del. 2000)).

[27] *Id.* (citing *Shepherd*, 752 A.2d at 537).

[28] *Frost v. DFS*, 2013 WL 989363, at *3 (Del. Mar. 12, 2013) (quoting 13 *Del. C.* § 1103(a)(5)) (alteration in original).

[29] *Boyer-Coulson v. DFS*, 2012 WL 1944868, at *2 (Del. May 30, 2012).

8

a substance abuse assessment and comply with all recommendations[;] complete a mental health assessment and comply with all recommendations[;] comply with all aspects of her probation or parole[;] [and] have positive visitation with [the Twins][.][30]

(16) The Family Court found that George "successfully completed 25% of her case plan; this does not constitute 'substantial compliance.'"[31] The court's determinations as to each of the Case Plan's eight requirements are supported on the record by clear and convincing evidence.[32] The Family Court also considered the

---

[30] B135-41.

[31] Fam. Ct. Op. at 24. Specifically, the Family Court found that George failed to maintain satisfactory living arrangements (Fam. Ct. Op. at 17-19); did not successfully complete the financial and resource management aspect of her Case Plan by failing to "provide concrete plans on how she intend[ed] to provide" for the Twins (Fam. Ct. Op. at 20); failed to adequately participate in the Twins' medical care (Fam. Ct. Op. at 21); did not consistently engage in substance abuse treatment (Fam. Ct. Op. at 22); "failed to engage in mental health treatment" (Fam. Ct. Op. at 23); and failed to comply with the requirements of her probation or parole by "incurr[ing] shoplifting and domestic violence charges since [the Twins] have been in custody." Fam. Ct. Op. at 23. The court determined, however, that George substantially complied with both parenting classes and visitation requirements. Fam. Ct. Op. at 20, 23.

[32] For instance, George was required to provide an appropriate home, including permitting DFS to ensure that other residents were appropriate to be around the Twins. During a DFS visit, George stated that a woman DFS found sleeping in George's home was her cousin. George later admitted that the woman was J.M., with whom George was in a relationship even though George had been ordered to have no contact with her due to a domestic incident. DFS, concerned about J.M.'s drug use and criminal history, required that J.M. participate in planning and parenting classes if George wanted to continue their relationship. Although J.M. refused to participate, George nevertheless continued the relationship, testifying that she and J.M. lived as a married couple.

Additionally, George was required to attend all of the Twins' scheduled medical appointments and to provide a documented excuse if she could not attend. George testified that "for the most part" she attended all visits of which she was notified. A witness for DFS testified that George was notified of all "scheduled" (i.e., non-emergent) appointments. Of 17 appointments, George attended five. However, the DFS witness acknowledged that some of the ones she missed were not scheduled; presumably, George may not have received notice of these appointments. The Family Court found that George "attended less than 30% of the [Twins'] medical appointments since they have entered care." It is not clear whether the court included all visits or only scheduled/noticed visits in its calculation. Nevertheless, testimony for DFS confirmed that George missed six scheduled visits.

George was also required to have substance abuse and mental health evaluations and comply with all recommendations. George testified that she was involved in a substance abuse

additional statutory elements for granting the TPR.[33] Although Section 1103(a)(5) requires satisfaction of only one of five elements, the court found that DFS established four. George has not appealed this aspect of the Court's ruling. However, we note for completeness that the court's findings are supported by the record and are not clearly wrong.[34]

(17) Because the court properly applied the law and made factual determinations sufficiently supported by the record that are not clearly wrong, it did not abuse its discretion in determining that DFS proved by clear and convincing evidence that George failed to adequately plan for the Twins' care.

---

and mental health program but had recently "missed a few" appointments. A witness for DFS confirmed that since May 2015, George attended six appointments and missed seven. George also tested positive for marijuana in September 2015, which George testified occurred because she spent a day "around people who were using[,]" which she acknowledged she "shouldn't have been" doing.

George was further required to "comply with all aspects of her probation" and "not incur[] any further charges." George failed to meet this aspect of her Case Plan because she was arrested for shoplifting and criminal mischief. George also admitted to violating the no contact order that resulted from the domestic incident with J.M.

[33] 13 *Del. C.* § 1103(a)(5)(a.)(1-5).

[34] Specifically, the Twins, who were approximately 18 months old at the time of the hearing and had been in DFS custody since their birth, were in the care of DFS for over six months. Fam. Ct. Op. at 24; *see* 13 *Del. C.* § 1103(a)(5)(a.)(1). Additionally, George's history with DFS, dating back to 2008, establishes a "history of neglect" of the Twins and "other children by" George. Fam. Ct. Op. at 24-26; *see* 13 *Del. C.* § 1103(a)(5)(a.)(2). Further, the court found that George's "financial instability" prevented her from "assum[ing] promptly legal and physical custody" and providing for the Twins. Fam. Ct. Op. at 27; *see* 13 *Del. C.* § 1103(a)(5)(a.)(4). George was employed part time as a server at Bob Evans, making $2.23 per hour plus $5 to $150 per night in tips. B76 (Tr. 110:14-21). George failed to create a budget as required by her Case Plan; instead, she developed a system in which she saved her cash tips and used her wages for living expenses, dipping into the cash savings as needed. Finally, the court determined that failing to grant the TPR would "result in continued emotional instability or physical risk to" the Twins based on George's ongoing mental health and substance abuse issues, lack of progression with her Case Plan, and demonstrated inability to care for her four other children. Fam. Ct. Op. at 27-29; *see* 13 *Del. C.* § 1103(a)(5)(a.)(5)(A-C).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court in its decision of February 22, 2016 is AFFIRMED.

BY THE COURT:

/s/ *Karen L. Valihura*
Justice