Susan HUGHES and Walter
H. Vernon,[1] Respondents
Below–Appellants,

v.

DIVISION OF FAMILY SERVICES,
Petitioner Below–Appellee.

No. 95,2002.

Supreme Court of Delaware.

Submitted: Aug. 8, 2003.
Decided: Oct. 29, 2003.

1. The Court previously assigned pseudonyms to the appellants pursuant to Supreme Court Rule 7(d).

Margaret R. Cooper, Esquire, Hudson, Jones, Jaywork & Fisher, Georgetown, Delaware, attorney for appellants.

James S. Reichert, Esquire, Department of Justice, Georgetown, Delaware, for appellee.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices (constituting the Court en Banc).

HOLLAND, Justice.

The respondents-appellants, Susan Hughes (the "Mother") and Walter H. Vernon (the "Father", or collectively, "the parents"), filed a timely notice of appeal with this Court from a final judgment of the Family Court. Pursuant to that judgment, the Family Court granted the petition of the Division of Family Services ("DFS"), petitioner-appellee, to terminate the Mother's and the Father's parental rights.

The Mother and the Father have raised three issues on appeal. First, they argue that the decision of the Family Court to terminate their parental rights, based on

the couple's failure to plan, was not supported by clear and convincing evidence and was not the result of a logical deductive reasoning process. Second, they argue that the Family Court erred in finding that DFS had exerted all reasonable efforts to reunify the child with her natural parents. Third, the Mother and the Father submit that their due process rights under both the United States Constitution and the Delaware Constitution were violated by the failure of the Family Court to appoint an attorney to represent the Mother and the Father at the outset of the dependency and neglect proceedings.

The Father died during the pendency of this appeal and his estate does not contest the termination of the Father's parental rights. We conclude that the Family Court's decision to terminate the Mother's parental rights based upon their failure to plan is supported by clear and convincing evidence and was the product of a logical deductive process. We further conclude that the Family Court properly determined that the failure to appoint counsel to represent the Mother during the dependency and neglect proceedings constituted harmless error under the circumstances of this case. The issue of reunification is also without merit and is addressed within our analysis of the Mother's other two contentions in this appeal. Accordingly, the judgments of the Family Court must be affirmed.

### Facts [2]

On November 24, 1999, DFS received a report that the Mother had given birth to Debbie Hughes (the "Minor Child"). Before the time that the Mother entered the emergency room in labor, she had not received any prenatal care.[3] Both the Mother and the newborn child tested positive for cocaine. Because of the condition of the newborn child, DFS was contacted by hospital personnel. A DFS treatment worker met with the Mother at the hospital. Initially, the Mother denied cocaine use, but then acknowledged that she had put cocaine on her gums.

Because of concerns about the Mother's ability to care for the Minor Child, DFS contacted the Mother's sister (the "Maternal Aunt") and inquired whether she would be in a position to take the newborn child home with her. The Maternal Aunt, already having placement of three of the Mother's children, expressed concern for having to care for a fourth child. Nevertheless, she agreed to take the Minor Child, rather than having the child placed into foster care. Several days after delivery, the newborn child was released into the custody of the Maternal Aunt, and was subsequently transferred to the care of the Maternal Grandmother at the request of the Maternal Aunt. The Maternal Grandmother had also been approved by DFS for temporary placement of the Minor Child.

On December 2, 1999, the Mother, the Maternal Grandmother and another family member came to DFS's center and requested formula for the Minor Child. During the visit, the DFS caseworker became concerned when she discovered that the formula the family was feeding the Minor Child was sour, that the family had no other formula for the infant, and that neither the Mother, the Maternal Grandmother or the other family member could remember the Minor Child's name. The

2. There is no substantial dispute between the parties about the material facts. The recitation in this opinion relies extensively upon the brief filed on behalf of DFS and the Family Court's opinion following remand.

3. At trial, it was learned that the Mother had not received prenatal care for any of her other three children.

caseworker also attempted to discuss substance abuse treatment with the Mother, but the Mother would not discuss that subject, and again denied using cocaine. Based on these observations and discussions, DFS applied for and received emergency custody of the Minor Child that same day.

A probable cause hearing was scheduled for December 9, 1999. Neither the Mother nor the Father was served, however, because the Mother's whereabouts had become unknown. Additionally, DFS had been unable to make contact with the Father, who had only recently been identified as a possible parent. As a result, neither parent appeared at the hearing. The Family Court continued custody of the Minor Child with DFS, on the basis of its finding that both the Mother and the Minor Child had tested positive for cocaine at the time of the child's birth. The Family Court further ordered that service of process be accomplished with respect to both parents.

On February 8, 2002, the Mother and the Father, accompanied by the Maternal Grandmother, visited DFS' office. This was the Father's first contact with any DFS worker. By this time, the Minor Child was two and one-half months old, and had been in foster care for two months. The Father stated that he was unable to care for the Minor Child and could not provide names of any family relatives who could provide a home for his daughter. Additionally, the DFS caseworker determined that the Mother had consumed alcoholic beverages before coming to the DFS meeting. Therefore, the meeting was rescheduled, and the caseworker advised the Mother that she would need to be sober the next time they conferred.

The Mother and the Father next met with DFS on February 16, 2000. They were transported to the DFS office by the Maternal Grandmother. The Mother stated that she would soon be incarcerated for six to twelve months and was unwilling to discuss any plans for the Minor Child. The Father reiterated that he was unable to care for the Minor Child. The Maternal Grandmother, for the first time, stated that she would be interested in having the Minor Child placed with her and that she would be filing a petition for guardianship. Neither the Mother nor the Father asked the DFS worker to schedule a visit for them with the Minor Child at this time.

An adjudicatory hearing was scheduled for March 16, 2000. By that time, the Mother was incarcerated. Because the Mother was not transported to the Family Court from the Women's Correctional Institute for that March hearing, however, the Family Court scheduled a new hearing.

On May 26, 2000, an adjudicatory hearing was held in the Family Court. This time, both the Mother and the Father were present. The Mother remained incarcerated and was unable to provide the Family Court with a date for her release. The Father stated that he was unwilling to care for the Minor Child.

The Family Court considered a guardianship petition filed by the Maternal Grandmother. That petition was denied. A second maternal aunt also filed a guardianship petition, but that petition was dismissed after she failed to appear in the Family Court.

A dispositional hearing was held on July 13, 2000. DFS advised the Family Court it was willing to consider the possibility of placement with the Maternal Grandmother. The Family Court considered a case plan presented by DFS outlining steps to be taken by the Maternal Grandmother before DFS would place the Minor Child

in her care. The Maternal Grandmother declined to sign the case plan at the July hearing and instead asked to take it home to read.

A review hearing was held on October 19, 2000. The Mother and the Father were present at the hearing, but the Maternal Grandmother did not attend. The Mother was still incarcerated and participating in a drug rehabilitation program. The Father continued to assert that he was unable to care for his daughter. DFS reported that the Maternal Grandmother had refused to sign the case plan proposed by DFS at the July hearing, and had not visited with the Minor Child. The Family Court asked the Mother and the Father to provide DFS with the names of any relatives who could care for the Minor Child. The Mother suggested that one of her sisters might be willing to provide care.

On December 15, 2000, a permanency hearing was held. At that time, the Mother was still in jail and not expected to be released until February 21, 2002, and the Father remained unwilling to provide care for his daughter. Only one of Mother's sisters had contacted DFS as a possible placement for the Minor Child.

After being advised that she would have to file a petition for guardianship to be considered for placement, that sister failed to do so. Thus, that sister's home was never considered for placement by DFS. Based on the Mother and the Father's inability to care for the Minor Child, and because of the lack of any suitable relatives coming forward to offer their home for placement, the Family Court approved the DFS request to change the goal for the Minor Child from reunification to a termination of parental rights.

The termination hearing took place over two days, on October 25, 2001 and January 24, 2002. The Mother and the Father were represented by counsel. This was the first time that either the Mother or the Father were represented by counsel at a hearing in matters involving the Minor Child.

At that time, the Mother was still incarcerated. The Family Court heard testimony from two individuals who were involved with the Mother's substance abuse treatment while she was incarcerated. It was noted that the earliest that the Mother would complete her treatment was August 21, 2002, six months after her original expected release date and approximately eight months from the last day of the termination hearing.

The Mother testified about her substance abuse problem. She supported the petition for guardianship of the Minor Child that had been filed by her sister, the Minor Child's maternal aunt, after the commencement of the termination proceedings. The Mother stated, however, that placement with the Maternal Aunt was not her permanent plan for the Minor Child. Rather, the Mother's plan was for the Minor Child to remain with the Maternal Aunt long enough for the Mother to "get back on her feet," when she would take back custody from the Maternal Aunt. The Mother also testified that although she was not in favor of the Maternal Aunt having permanent custody of the Minor Child, she would consider it if there was no other alternative.

### Family Court Termination Decision

The Family Court issued its opinion on February 4, 2002. After finding a failure to plan by both the Mother and the Father, and after finding that it was in the best interests of the Minor Child, the Family Court granted DFS' petition for termination of the Mother's and the Father's parental rights. At the same time, the Family Court denied the Maternal Aunt's petition for guardianship, conclud-

ing that it was in the Minor Child's "best interests that she continue to reside in the home of her foster family, so that a permanency goal of adoption by the foster family can be achieved."

### Family Court Decision on Remand

Both the Mother and the Father appealed the Family Court's termination judgments. While those appeals were pending, this Court was notified that the Father had died. During the pendency of this appeal, we also decided *Watson v. Division of Family Services,*[4] in which we held that pursuant to the United States and Delaware Constitutions, a trial judge must decide whether counsel for indigent parents in a dependency and neglect proceeding should be appointed on a case-by-case basis.

We remanded this matter to the Family Court to consider the implications of the Father's death on these proceedings and to ascertain whether the Father's personal representative intended to appear and assert an interest in this matter on behalf of the father's estate. The remand order also directed the Family Court to determine, in accordance with *Watson,* whether the parents had been denied their due process rights based on the failure to appoint counsel for them at the outset of the dependency and neglect proceedings.

At the remand hearing, the Family Court heard limited testimony and argument from counsel in accordance with this Court's remand order. On April 25, 2003, the Family Court issued its findings of fact and conclusions of law. The Family Court held that, because the Mother was incarcerated from the time of her initial court appearance through the conclusion of the termination proceedings—a period of almost two years—appointment of counsel for the Mother at the dependency proceed-

ing would not have affected the outcome of the termination proceeding. Accordingly, the Family Court determined that the failure to appoint counsel for the Mother at the dependency and neglect proceedings constituted harmless error.

With respect to the Father, the Family Court concluded that because he was never interested in reunification with his child, the appointment of an attorney would not have resulted in a different outcome for him either. The Family Court also found that the Father's death terminated his interest in the matter. The personal representative of the Father's estate had expressed no desire to appear and assert an interest in the Family Court proceeding.

The Father's estate does not contest the Family Court's findings of fact and holdings of law. The Mother does not contest the Family Court's holding that the Father's rights are no longer at issue. The Mother does contest, however, the Family Court determination that the failure to appointment of counsel at the dependency and neglect proceedings did not violate her due process rights. Additionally, the Mother continues to appeal the termination of her parental rights on the merits.

### Failure to Plan Established

The Mother's first contention on appeal is that the decision of the Family Court to terminate her parental rights, based on her failure to plan, was not supported by clear and convincing evidence and was not the result of a logical deductive reasoning process. In support of that contention, the Mother argues that her plan was participation in a drug treatment program while incarcerated and for the Minor Child to live with a relative. The Mother submits that this was an adequate permanent plan for the Minor Child. The record supports

4. *Watson v. Div. of Family Servs.,* 813 A.2d     1101 (Del.2002).

the determination by the Family Court to the contrary, as a matter of both fact and law.

The Family Court has authority to grant a DFS petition for the termination of parental rights, if DFS proves by clear and convincing evidence: first, that facts justifying termination under Delaware law exist, and second, that such a determination is in the best interest of the child.[5] In addition, the Family Court must be satisfied that DFS has made all reasonable efforts to preserve the family unit.[6] Moreover, when the termination of parental rights is based primarily on the ground of failure to plan, " 'the [Family Court] is required to make appropriate findings of fact and conclusions of as to the State's *bona fide* efforts to meet its own obligations.' "[7]

In this case, the Family Court granted termination of the Mother's parental rights based on a failure to plan, pursuant to Title 13, Section 1103(a)(5), which authorizes such termination where:

(5) The parent or parents of the child, or any person or persons holding parental rights over the child, are not able, or have failed to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met. . . . [8]

---

5. *See Div. of Family Servs. v. Hutton*, 765 A.2d 1267, 1271 (Del.2001); *Shepherd v. Clemens*, 752 A.2d 533, 536–37 (Del.2000) (*en banc*).

6. *See In re Hanks*, 553 A.2d 1171, 1179 (Del. 1989).

7. *Id.* (quoting *In re Burns*, 519 A.2d 638, 649 (Del.1986)).

8. Those conditions are listed as follows:
    a. In the case of a child in the care of the Department or a licensed agency:
    1. The child has been in the care of the Department or licensed agency for a period of 1 year, or for a period of 6 months in the case of a child who comes into care as an infant, or there is a history of previous placement or placements of this child; or
    2. There is a history of neglect, abuse or lack of care of the child or other children by the respondent; or
    3. The respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration, except that the Court may consider post-conviction conduct of the respondent; or
    4. The respondent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the respondent's financial means; or
    5. Failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child. In making a determination under this paragraph, the Court shall consider all relevant factors, including:
    A. Whether the conditions that led to the child's placement, or similar conditions of a harmful nature, continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the respondent to discharge parental responsibilities so that the child can be returned to the respondent in the near future;
    B. The respondent's efforts to assert parental rights of the child, and the role of other persons in thwarting the respondent's efforts to assert such rights;
    C. The respondent's ability to care for the child, the age of the child, the quality of any previous relationship between the respondent and the child or any other children;
    D. The effect of a change of physical custody on the child; and
    E. The effect of a delay in termination on the chances for a child to be placed for adoption.
    b. In the case of a child in the home of a stepparent or blood relative:
    1. The child has resided in the home of the stepparent or blood relative for a period of at least 1 year, or for a period of 6 months in the case of an infant; and
    2. The Court finds the respondent is incapable of discharging parental responsibilities, and there appears to be little likelihood that the respondent will be able to

The Mother challenges only the Family Court's finding of failure to plan. She does not challenge the Family Court's conclusion that at least one of the conditions listed under Section 1103(a)(5)(a)—namely, that the Minor Child had been in the care of DFS for a period in excess of six months—had been met. Accordingly, as to the Mother's first contention on appeal, the question for this Court to decide is whether DFS met its burden of proof on the issue of failure to plan.

■ The record reflects clear and convincing evidence of the Mother's failure to plan for the care of her Minor Child. Neither the Mother nor the Father were capable of caring for their Minor Child from the period beginning with the dependency and neglect hearings, and continuing through the termination of their parental rights. The Father stated under oath on several occasions that he was unable to care for the Minor Child. His only plan for his Minor Child was that she be placed with another relative. No suitable relative could be located, however, and the Father offered no other plan for his child, even though the Minor Child had been in foster care for over two years.

Throughout most of the proceedings, the Mother was incarcerated. Before being incarcerated, she admitted to using and selling cocaine. She also acknowledged that she was unable to care for her Minor Child. The earliest that the Mother was originally expected to be released was February 21, 2002. Even if the Mother had been released on that date, she would have needed to establish a minimum of six months of sobriety and outpatient treatment before she could complete the drug

and alcohol treatment program ordered as part of her criminal sentence. The termination hearings were held on October 25, 2001 and January 24, 2002.

Nevertheless, the Mother argues that she did plan for the care of her Minor Child in that she was participating in a drug treatment program while incarcerated and had completed a parenting class. As the Family Court noted, at the time of the permanency hearing, the Mother "admit[ted] that she [would] not be in a position to care for [the Minor Child] for several months, or longer." This time frame was not compatible with the statutory mandate of the Adoption and Safe Families Act of 1997 ("ASFA").[9]

Under ASFA, each state must formulate a system for conducting a permanency hearing for each child, once the child has been in state foster care for twelve months.[10] The purpose of the permanency hearing is to approve a "permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, ... or placed in another planned permanent living arrangement ...."[11] Thus, the statutory frameworks enacted by both the General Assembly and Congress do not afford parents an unlimited period of time to address and resolve the issues that caused their children to be found dependent or neglected. This Court has also acknowledged the right of children to have timely permanency decisions made on their behalf and to be heard in proceedings where their vital interests are

discharge such parental responsibilities in the near future.
Del.Code Ann. tit. 13, § 1103(a)(5)(a)-(b) (1999).

**9.** 42 U.S.C. §§ 620–279 (1998).

**10.** *See id.* § 675(5)(C); *Brown v. Div. of Family Servs.,* 803 A.2d 948, 953 (Del.2002).

**11.** 42 U.S.C. § 675(5)(C).

at stake.[12]

In this case, the Mother and the Father had several opportunities to develop a suitable plan for their daughter's care within a time frame of approximately two years. They never did. Because neither parent was able to care for their daughter, each believed the Minor Child would be placed with a relative. The relatives suggested for placement of the Minor Child, however, were either found not suitable, failed to petition the Family Court, or failed to appear on the day scheduled for their hearings.

The Mother and the Father did not develop any alternative plan. Because neither the Mother nor the Father offered the Family Court a timely plan for the permanent placement of their Minor Child, the Family Court found that DFS had presented clear and convincing evidence of a failure to plan by both parents.

■ The Mother contends, nevertheless, that the Family Court should have considered and granted the petition for guardianship of the Maternal Aunt as an appropriate plan for the Minor Child. This argument fails for two reasons. First, the record shows that the Family Court considered and rejected the Maternal Aunt's guardianship petition. Trial on the Maternal Aunt's guardianship petition was held on the same days as the trial on the termination petition. After hearing the evidence, the Family Court determined that it would be contrary to the Minor Child's best interest to be placed into the home of the Maternal Aunt. Consequently, the Mother's claim that DFS and the Family Court failed to properly consider the merits of the guardianship petition of the Maternal Aunt is not supported by the record.

■ Second, this Court has no jurisdiction to consider the Mother's challenge to the Family Court's decision that denied the guardianship petition of the Maternal Aunt. Because the Maternal Aunt is not a party to this present appeal, and because she did not file an appeal in her own right, this Court lacks subject matter jurisdiction to consider that claim. The Mother may not now expand the issues on appeal in this termination proceeding to include the guardianship petition of the Maternal Aunt.[13] The Family Court held that placing the minor child in a guardianship with the Maternal Aunt would not be in the Minor Child's best interest. In the absence of a timely appeal by the Maternal Aunt, the Family Court's judgment on that issue is considered final.[14]

The record also reflects that the Family Court carefully considered the circumstances of both the Mother and the Father. The Father never expressed any serious desire to care for the Minor Child. The Mother was incarcerated and was unable to care for the Minor Child herself. Her plan consisted of participation in, and anticipated completion of, a drug treatment program while incarcerated. The Mother still would not have been in a position to care for her daughter immediately upon release and, in fact, many months following the Mother's release would have passed before she could even be considered as placement for her child.

---

**12.** See Brown v. Div. of Family Servs., 803 A.2d at 953–54; Shepherd v. Clemens, 752 A.2d at 538–39; In re Frazer, 721 A.2d 920, 923 (Del.1998).

**13.** See Trowell v. Diamond Supply Co., 91 A.2d 797, 801 (1952).

**14.** See Carr v. State, 554 A.2d 778 (Del.), cert. denied 493 U.S. 829, 110 S.Ct. 98, 107 L.Ed.2d 61 (1989).

Additionally, relatives that the Mother believed could be placements for the Minor Child either had their guardianship petitions considered and denied by the Family Court as not in the child's best interests, or did not appear for their scheduled hearings, or did not actually file a petition. Accordingly, we hold that the Family Court's termination of the Mother's parental rights based upon a failure to plan for her Minor Child is supported in the record by clear convincing evidence and is the product of a logical deductive reasoning process.

### Dependency Due Process Claim

The Mother next contends that her due process rights under both the United States Constitution and the Delaware Constitution were violated by the failure of the Family Court to appoint an attorney to represent her at the outset of the dependency and neglect proceedings. Although both parents were indigent, neither the Mother nor the Father was represented by counsel throughout the course of the dependency and neglect proceedings. Not until the conclusion of the dependency and neglect proceedings did the Family Court appoint counsel to represent the indigent parents in the termination of parental rights proceedings.

During the pendency of this appeal, we decided *Watson v. Division of Family Services.*[15] In *Watson,* this Court held that both the United States and Delaware Constitutions require a trial judge to determine whether to appoint counsel at State expense for indigent parents in a dependency and neglect petition on a case-by-

case basis. We recognized in *Watson* that the proper application of that holding would routinely require the appointment of counsel at State expense for indigent parents in virtually every dependency and neglect proceeding.[16]

We remanded this matter to the Family Court to determine whether, "in accordance with our decision in *Watson,* ... the failure to appoint counsel at the outset of the dependency and neglect proceeding violated the parents' rights to due process in this case." On remand, the Family Court recognized that, under our holding in *Watson,* those indigent parents would have been entitled to representation by appointed counsel at State expense. Nevertheless, the Family Court concluded that, by the failure to appoint counsel for the Mother, any violation of the Mother's due process rights during the dependency and neglect proceedings was harmless error because the outcome of the termination proceedings would have been the same.

### Dependency and Termination Continuum

In several prior opinions, this Court has discussed the continuum that begins with a dependency and neglect hearing and frequently evolves into and ends with a termination proceeding.[17] We have acknowledged that the factual basis for terminating parental rights is often the conduct that occurs during the time frame between the commencement of a dependency and neglect proceeding and a judicial determination that a termination proceeding is in the child's best interest.[18] Accordingly, in *Watson,* we recognized

---

**15.** *Watson v. Div. of Family Servs.,* 813 A.2d 1101 (Del.2002).

**16.** *Watson v. Div. of Family Servs.,* 813 A.2d at 1109.

**17.** *See Brown v. Div. of Family Servs.,* 803 A.2d 948, 951 (Del.2002); *Watson v. Div. of Family Servs.,* 813 A.2d 1101, 1106 (Del. 2002).

**18.** *See Watson v. Div. of Family Servs.,* 813 A.2d at 1106.

that "[i]f an attorney is only appointed to represent an indigent parent after the petition to terminate has been filed then the outcome is almost inevitable, assuming the factual allegations in the petition to terminate can be established with credible evidence." [19]  Because of this "almost inevitable" outcome, we held in *Watson* that both the United States Constitution and the Delaware Constitution required the issue of whether to appoint counsel at State expense must be decided by the trial judge on a case-by-case basis [20] in all dependency and neglect proceedings commenced against an indigent parent. [21]

### Dependency Representation Analysis

■  Trial judges have been making similar case-by-case determinations in termination proceedings since the *Lassiter* decision by the United States Supreme Court [22] and this Court's analysis of *Lassiter* in *In re Carolyn S.S.* [23] In *Lassiter*, the United States Supreme Court held there is a "presumption that an indigent litigant has a right to appointed counsel only when, if he looses, he may be deprived of his physical liberty." [24]  In termination proceedings, the *Lassiter* presumption against a right to appointed counsel, except where a litigant's physical liberty is at stake, must be balanced against the sum total of three elements to be evaluated in deciding what due process requires. [25]  The

three factors identified by the United States Supreme Court in *Mathews v. Eldridge* are: first, the private interests at stake; second, the government's interests; and third, the risk that procedures used will lead to an erroneous result. [26]

In *Watson*, we recognized that the private interests at stake in dependency and neglect proceedings are compelling, because "the parent faces the loss of temporary custody of her child that may eventually lead to permanent termination." [27]  Because of that compelling interest, we concluded that the parents' right to "companionship, care, custody and management" of their children, enunciated by the United States Supreme Court in *Lassiter*, not only requires deference, but also warrants protection.

The compelling interest of the parent must always be balanced against the interest of the government, which we described in *Watson* as the welfare of children and in fostering an accurate decision. [28]  Additionally, we noted that ASFA requires a permanency decision to be rendered as quickly and efficiently as possible. [29]  But, following the United States Supreme Court's similar analysis in *Lassiter*, we concluded that the government's interest, although significant, "is not enough to override the great compelling interests of

19.  *Id.*

20.  *Id.* at 1103.

21.  *Id.* at 1109.

22.  *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

23.  *In re Carolyn S.S.*, 498 A.2d 1095, 1098 (Del.1984).

24.  *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. at 26–27, 101 S.Ct. 2153.

25.  *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

26.  *Id.* at 335, 96 S.Ct. 893.  These factors are now commonly referred to as the *Eldridge* factors.

27.  *Watson v. Div. of Family Servs.*, 813 A.2d 1101, 1110 (Del.2002).

28.  *Id.*

29.  42  U.S.C.  §§ 671(a)(15)(A),  675(5)(E) (1998).

the parents that are at stake." [30]

Most importantly, however, the interests of the parents and the interest of government must both be balanced against the risk that the procedures used will lead to an erroneous result. Dependency and neglect proceedings will often be complex, and may involve weighing many factors and several court hearings. In such matters—indeed, in any litigation—the absence of counsel increases the potential of an erroneous result. In *Watson,* we held that this third factor will routinely require the appointment of counsel at State expense for indigent parents in every dependency and neglect proceeding to ensure that an erroneous result does not occur. [31]

In this case, in the absence of representation by appointed counsel, the primary safeguard for the Mother's due process rights was periodic judicial review, which occurred in the form of multiple Family Court hearings, [32] and took place before a Family Court judge. That same judge conducted the remand hearing and was in the best position to determine whether the appointment of counsel at any stage in the dependency proceedings would have increased the risk of an erroneous result. [33] That judge concluded, in this case, that the failure to appoint counsel was a harmless error because, even with the effective assistance of counsel, the result would have been the same, i.e., the Mother's parental rights would have been terminated.

The General Assembly has appropriated funds to contract with attorneys to provide legal representation in accordance with the State and Federal Constitutional mandates upon which this Court based its holding in *Watson.* [34] In 2002, the Family Court Civil Procedure Rules were amended to provide for mandatory appointment of an attorney in the case of an indigent party if so requested by that party. [35] Consequently, it should be unnecessary to conduct a harmless error analysis in future cases because the Family Court will routinely be appointing counsel to represent an indigent parent in a dependency and neglect proceeding.

### Harmless Error Analysis

On remand, the Family Court conducted its harmless error review by applying the three-part due process analysis prescribed by the United States Supreme Court in *Lassiter* [36] that formed the basis for this Court's holding in *Watson.* [37] The Mother does not challenge the Family Court's findings with respect to the first two parts of the three-part analysis. The Mother challenges only the Family Court's evaluation of whether the procedures used led to an erroneous result in the absence of her representation by an attorney.

■ The Minor Child went into foster care on December 9, 1999. Accordingly, ASFA required that a permanency plan for the Minor Child be developed by De-

**30.** *Watson v. Div. of Family Servs.,* 813 A.2d at 1110.

**31.** *Id.* at 1109.

**32.** Today, the practice of periodic judicial review is set forth explicitly in Family Court Rules 212–17.

**33.** *Cf. Banther v. State,* 823 A.2d 467, 487 (Del.2003) (noting that trial judge is in best position to weigh prejudicial effects of evidence).

**34.** *Watson v. Div. of Family Servs.,* 813 A.2d at 1109.

**35.** *See* Fam. Ct. R. 206, 207.

**36.** *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

**37.** *Watson v. Div. of Family Servs.,* 813 A.2d 1101 (Del.2002).

cember of 2000. It is undisputed that the Mother was unable to provide a home for her Minor Child because of her incarceration. Federal requirements of permanency under ASFA dictated that the Minor Child's placement be resolved long before the Mother was scheduled to be released from jail and, thereafter, finished with her drug rehabilitation program.[38] The record supports the Family Court's conclusion that appointed counsel would not have been able to remove the impediment caused by the Mother's incarceration.

The Mother contends that, had counsel been appointed, the attorney could have sought relatives for placement that would have eliminated the need to terminate the Mother's parental rights. The Mother proposed numerous relatives as possible placements. But, as previously discussed, all of those relatives' petitions were either rejected on the merits or dismissed for failure to appear, and some of the other relatives identified by the Mother failed to file a petition at all.

One relative placement specifically identified in the Mother's brief is the Maternal Aunt. The Maternal Aunt was considered by the Family Court for placement and was rejected. On the same days as the termination hearing, the Family Court held a hearing on the Maternal Aunt's petition for guardianship and denied that petition on the merits as not being in the best interests of the Minor Child.

Moreover and significantly, DFS did place the Minor Child with the Maternal Aunt before it took custody, but she declined to keep the child in the home. Indeed, the Maternal Aunt initially expressed reluctance to take the Minor Child, because she was already providing care for the Mother's other three children. Nevertheless, the Minor Child was briefly placed with the Maternal Aunt, but was soon removed by DFS at the request of the Maternal Aunt and placed with the Maternal Grandmother. The Maternal Aunt never contacted DFS concerning placement of the Minor Child again until after the termination petition had been filed.

Although both DFS and the Family Court considered the Maternal Aunt for possible placement of the Minor Child, the record supports the Family Court's determination that it was in the Minor Child's best interests to remain in foster care. The Family Court properly concluded that appointment of counsel for the Mother would not have changed the outcome of the Maternal Aunt's guardianship petition.

The Family Court also considered several other relatives suggested by the Mother for possible placement. Two of those relative's guardianship petitions were denied, one relative failed to appear in the Family Court for a scheduled hearing, and two other relatives failed to file petitions at all after being contacted by DFS. The Family Court concluded that "no credible evidence has been presented ... to indicate that other placement relatives exist." Therefore, the record supports the Family Court's determination on remand that appointed counsel would not have been able to assist the Mother in attempting to locate other relatives for placement of the Minor Child.

---

38. The Mother was sentenced on April 14, 2000 to five years at Level V. Upon successful completion of a Level V drug treatment program, her sentence was to be suspended for placement at a Level IV drug treatment program for fifteen months, to be followed by two and one-half years of probation. Mother was actually released from Level IV on March 5, 2002. ASFA requires state courts to determine a permanency plan for a child within twelve months following the child's entrance into foster care. *See* 42 U.S.C. § 675(5)(C).

The Mother raises several other contentions to support her argument that the Family Court erred in concluding that no due process violation had resulted from the failure to appoint counsel to represent her in the dependency proceedings. First, the Mother submits that, because she had a substance abuse problem at the time the Minor Child was born, counsel should have been appointed to represent her. To be sure, in *Watson*, this Court found that an unincarcerated mother's untreated substance abuse and mental health problems made it impossible for her to complete a case plan without the assistance of appointed counsel.[39] But *Watson* is distinguishable from the present matter. In *Watson*, this Court was concerned that, due to her untreated substance abuse and mental health problems, the unincarcerated mother lacked the ability to understand and complete her case plan.

None of those concerns is present here. In this case, appointed counsel would have played no role in helping the Mother to obtain treatment, because such treatment was actually made available to the Mother while she was incarcerated. Accordingly, there is no factual support for the assertion that the absence of appointed counsel led to an erroneous result.

Second, at the remand hearing, the Mother testified for the first time that she is illiterate. Her illiteracy, she claimed, interfered with her understanding of the proceedings. The Family Court noted that "Mother's illiteracy and unfamiliarity with [the] Court's proceedings placed her in a difficult position. It is likely that she was unable to read the pleadings filed by DFS .... It is just as likely that she could not read the several Court orders that

were issued." The Family Court further noted that the appointment of counsel would have assisted the Mother to understand the various legal documents, by explaining the procedures of the Family Court, and by participating in court hearings.

The Family Court concluded, nevertheless, that "despite Mother's participation in the dependency/neglect proceedings, there was never a likelihood that [the Minor Child] would be returning home with her." The Mother's incarceration and the lack of any suitable relative for placement of the Minor Child made that impossible. Accordingly, the record supports the Family Court's finding that appointment of counsel would not have changed the outcome, despite the Mother's illiteracy.

Nor do the facts of this case implicate our observation in *Watson* that due process tips the balance in favor of appointing counsel during the dependency and neglect stage of the proceedings when counsel can "advocate [a parent's] need for the reunification resources that are available through the DFS."[40] Here, the Mother's incarceration relieved DFS of any obligation to provide reunification services to her as a matter of law.[41] Because of the Mother's incarceration, no case plans for reunification were provided to the Mother during the dependency and neglect proceedings. Thus, appointed counsel would have played no role in assisting the Mother to complete a case plan involving reunification.

The Family Court concluded that, because of the Mother's incarceration throughout the dependency and neglect

---

**39.** *See Watson v. Div. of Family Servs.,* 813 A.2d at 1111.

**40.** *Watson v. Div. of Family Servs.,* 813 A.2d at 1111.

**41.** *See In re Heller,* 669 A.2d 25, 30 (Del.1995) (holding reunification services with an incarcerated parent are not required, if such serves are not feasible).

proceedings, and because of the absence of a suitable placement for the Minor Child other than foster care, no due process violations occurred by reason of the Mother's lack of appointed legal representation. We agree. In evaluating the due process claims of the Mother upon remand, the Family Court properly applied this Court's decision in *Watson* and the United States Supreme Court's decision in *Lassiter.* We hold that to the extent that the Mother's right to due process was violated by the absence of appointed counsel for the Mother during the dependency and neglect proceedings, the error was harmless.[42] The Family Court properly concluded that,

even with the assistance of counsel during the dependency and neglect proceedings, the continuum that ended with the termination of her parental rights would have yielded the same result.

### Conclusion

The judgments of the Family Court are affirmed.

---

**42.** *See Chapman v. California,* 386 U.S. 18, 20–21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and *Van Arsdall v. State,* 524 A.2d 3, 11 (Del. 1987). *See also In the Matter of C.V.,* 579 N.W.2d 17 (S.D.1998); *In the Interest of L.L.,* C.L., K.L. and L.L.,* 715 P.2d 334 (Colo.1986) and Jeffrey O. Cooper, *Searching for Harmlessness; Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine,* 50 U. Kan. L.Rev. 309 (2002).