Bobby WATERS,[1] Respondent Below, Appellant,

v.

DIVISION OF FAMILY SERVICES, and Court Appointed Special Advocate, Petitioners Below, Appellees.

No. 498, 2005.

Supreme Court of Delaware.

Submitted: March 29, 2006.
Decided: July 17, 2006.

sault, and the VOP judge could have so concluded.

1. The Court, sua sponte, has adopted the pseudonyms used by and assigned to the parties in their briefing under SUPR. CT. R. 7(d).

Robert H. Robinson, Jr., Esquire, of Wilson, Halbrook & Bayard, P.A., Georgetown, Delaware; for Appellant.

Kathryn L. Welch, Esquire, Deputy Attorney General, Department of Justice, Georgetown, Delaware; for Appellee Division of Family Services.

James S. Reichert and Kristin S. Gibbons, Esquires, Georgetown, Delaware; Court Appointed Special Advocate.

Before BERGER, JACOBS and RIDGELY, Justices.

JACOBS, Justice.

Bobby Waters appeals from a Family Court order terminating his parental rights in his daughter, Ashley Gibson–Bruce ("Ashley"). Waters claims that the Division of Family Services ("DFS") and the trial court denied him procedural due process by refusing to: (i) allow him visitation rights, (ii) develop a reunification case plan, and (iii) attempt reunification as an option, before terminating his parental rights. Waters also claims that the decision to terminate his parental rights is not supported by clear and convincing evidence, and was not in Ashley's best interests. For the reasons next discussed, we reverse.

### FACTS

On December 18, 2002 DFS filed a Dependency and Neglect Petition involving three children of Lenny Bruce and Tara Gibson. The Family Court awarded DFS custody of those children on March 20, 2003. DFS created case plans for the parents, and attempted to reunify the parents with their three children.

On March 28, 2003 the children's mother, Tara Gibson ("Mother"), gave birth to a fourth child, Ashley. DFS petitioned for, and was awarded custody of, Ashley, whose father's identity at that time was undetermined. At the termination hearing, Mother testified that before Ashley was born she (Mother) told Waters that he might be the father. But, Mother also testified that she told Waters that the father was an unknown Hispanic man. At the hearing Waters testified that on one occasion Mother told him that the baby was not his, on a second occasion that the baby might be his, on a third occasion that the baby's father was her husband (Lenny Bruce) whose name is on the birth certificate, and on a fourth occasion that the infant was "a Spanish guy's baby." Waters also testified that Lenny Bruce told him that the baby was not Waters', but was "some Mexican guy's."

Mother eventually informed DFS that Waters might be the father. DFS then amended its petition for custody to add

Waters, a possible father, as an additional respondent in the Family Court proceeding. On April 17, 2003, the Family Court ordered Bruce and Waters to undergo genetic testing to determine Ashley's paternity.

DFS worked with Mother to locate Waters, but Mother had no information as to his whereabouts, other than that Waters might be in the Seaford area. Unable to locate Waters through the State's criminal information system records, DFS published a notice of the custody petition in a local newspaper in October 2003, but Waters did not respond. The reason (it later was learned) was that Waters had been incarcerated at the Sussex Correctional Institute ("SCI") from February 3, 2003 to June 7, 2003 and also from September 25, 2003 to April 30, 2004.

On November 5, 2003, DFS filed a petition for termination of parental rights ("TPR") in Ashley. Waters was served with the petition at SCI on December 1, 2003. On January 15, 2004, the Family Court held a permanency hearing as to all four minor children. At that hearing Mother, Bruce and Waters—all three of whom were then incarcerated—were present for the first time. Waters requested visitation rights with Ashley at the hearing, but DFS denied Waters' request.

At the January 15, 2004 hearing, the Family Court decided to end reunification efforts with the parents. The Court also approved a permanency plan to terminate parental rights in all the children, in order to facilitate their adoption, and again ordered the genetic testing of Bruce and Waters to determine who was Ashley's father.

On April 1, 2004, the Court held a status hearing on the TPR petition insofar as it related to Ashley. At that hearing, the parties learned (as a result of the genetic testing) that Waters was Ashley's biological father. Again, Waters requested visitation with Ashley, and again DFS denied that request. The Court assigned counsel to represent Waters in the TPR proceedings. During those proceedings Waters informed the Court that he would be released from jail at the end of that month— on April 30, 2004.

A trial on the termination petition took place on May 19 to 21, 2004, December 9 and 16, 2004, and February 24 and March 10, 2005. At the May 2004 trial dates, Waters appeared with counsel and again moved for visitation with Ashley. The Court denied that motion. Waters did not appear on the December trial dates, because (as he later explained to the trial judge) he "needed to get away" because his life had been really stressful at that time. Waters did appear on the 2005 trial dates, during which time he was incarcerated at the violation of probation (VOP) facility. Waters testified that to enable himself to care for Ashley, he (Waters) traded his five years of probation for 105 days of time at the VOP facility, so that he would be released without further probation on April 19, 2005.

On September 16, 2005, the Family Court terminated the parental rights of Mother, based on her consent. The Family Court also terminated Waters' parental rights in Ashley over Waters' objection. The Court found clear and convincing evidence that: (i) Waters had failed to plan, and was unable to plan, for Ashley; (ii) Ashley had been in the care of DFS for more than six months; (iii) Waters was incapable of discharging his parental responsibilities because of his repeated incarceration; (iv) Waters had intentionally abandoned Ashley; and that (v) terminating Waters' parental rights was in Ashley's best interests. Waters appeals from the order entered as a result of those rulings.

## ANALYSIS

 The Family Court may terminate parental rights when facts justifying such relief exist, based always on the best interests of the child. DFS must prove by clear and convincing evidence that termination of parental rights is essential to the child's welfare.[2]

DFS is a division of the Department of Services for Children, Youth, and their Families (the "Department").[3] The Department, including DFS, is required by statute, "to establish, implement, and follow procedures and standards compatible with due process of law with respect to ... any ... actions by the Department that may affect the legal rights of a child and the child's family."[4] The due process that the statute requires the Department to observe is also mandated by the United States and Delaware Constitutions. This Court has held that those due process requirements apply in termination of parental rights proceedings.[5]

 Waters claims that the Family Court deprived him of procedural due process by terminating his parental rights without requiring that DFS first make reasonable attempts to reunite him with Ashley. Waters further contends that the termination order was not supported by clear and convincing evidence, and was not in Ashley's best interests. This Court reviews termination of parental rights determinations to ensure that (i) they are supported by clear and convincing evidence of

record, and (ii) that the trial judge's conclusions are the result of an orderly and logical reasoning process.[6] Where a trial judge's decision implicates a ruling of law, our review is *de novo* to determine whether the trial judge properly applied the law.[7] Because we conclude that the State deprived Waters of due process by terminating his parental rights without first providing a case plan for Ashley or attempting reunification with her, we reverse without reaching Waters' evidentiary claims.[8]

## I.

 Waters first claims that the Family Court violated procedural due process by terminating his parental rights before DFS had made any efforts to reunify him with, or prepare a case plan for Ashley. In response the appellees, DFS and the Court Appointed Special Advocate ("CASA"), argue that: (1) the statutory scheme governing termination requires DFS to attempt reunification only where it is "feasible;" (2) once DFS began pursuing TPR, it was no longer feasible to attempt reunification; (3) the Family Court had previously decided that termination was the appropriate permanency plan for Ashley, and that to change course and begin reunification efforts would contravene the Adoption and Safe Families Act ("ASFA") and Family Court Civil Procedure Rule ("FCCPR") 216; and (4) in any event, no reunification efforts were legally required,

---

2. *In re Burns,* 519 A.2d 638, 643 (Del.1986) (citing *Patricia A.F. v. James R.F.,* 451 A.2d 830, 832 (Del.1982)).

3. 19 *Del. C.* § 9003(3)b.

4. 29 *Del. C.* § 9003(11).

5. *In re Burns,* 519 A.2d at 645 (addressing parental right to due process in TPR proceedings under the Delaware Constitution).

6. *Arthur–Lawrence v. Div. of Fam. Serv.,* 884 A.2d 511, 2005 WL 2397523, at *5 (Del. Supr.).

7. *Id.*

8. Within the context of our due process analysis, we do reach Waters' challenge to the Family Court's determination that Waters had abandoned Ashley, and conclude that that determination is not supported by clear and convincing evidence.

because the Family Court granted the TPR petition on the ground that Waters had abandoned Ashley.

The Family Court held that Waters had suffered no violation of due process rights because counsel had been appointed to represent him at the TPR proceedings, and because reunification services were not legally required in these circumstances. Under 13 *Del. C.* § 1103, DFS is not required to perform reunification services where the ground for TPR is abandonment. Here, the trial court found, Waters had abandoned Ashley. The trial court further found that "reunification services were not practical in this case[,]" [9] because Ashley had been in foster care for more than one year, and at the time the parties learned he was the father—the time when reunification efforts would ordinarily have begun—Waters was incarcerated.

Those contentions reduce to two issues on appeal: (1) was due process violated by terminating Waters' parental rights without DFS first attempting effectively to reunify [10] Waters with Ashley, and (2) was the trial court's conclusion that Waters had abandoned Ashley supported by clear and convincing evidence, thereby obviating any reunification requirement under the applicable statute? We address those issues separately.

## II.

■ When analyzing what process is due to a parent in a TPR proceeding, this Court considers three factors:

(1) the private interest that will be affected by the official action; (2) the risk that there will be an erroneous deprivation of the interest through the procedures used and the probable value of an additional or substitute procedural safeguards; and (3) the government interest involved, including the added fiscal and administrative burdens that addition or substitute procedure would require.[11]

In *Daber v. Division of Child Protective Services,*[12] we emphasized the fundamental importance of the first factor—the private interest at stake in termination cases:

Fewer rights are more sacred than those which derive from the parent-child relationship. A society which arrogates to itself the power to intervene and disrupt that relationship can do so only for the most compelling reasons necessary to correct or protect a child from circumstances which directly threaten or affect the minor's physical or emotional health. The State and its agencies are not in the business of determining or otherwise interfering with the parent-child relationship on any less substantial grounds.

In *Santosky v. Kramer,* the United States Supreme Court affirmed that same principle, stating that: "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."[13]

■ The third factor—the governmental interest involved—is also very strong. As

9. Fam. Ct. Order at 46 (Sept. 16, 2005).

10. Although for legal clarity we employ the statutory terms "reunify" and "reunification" in this Opinion, it would be more accurate (grammatically speaking) to use the terms "unify" and "unification," since Ashley and her biological father had never met.

11. *In re Burns,* 519 A.2d at 645 (citing *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

12. 470 A.2d 723, 726 (Del.1983).

13. *Santosky,* 455 U.S. at 753, 102 S.Ct. 1388.

we stated in *In re Hanks*, "[t]he State has an important interest in protecting the welfare of its minor children who have been placed in the custody of the State because their natural parents are unable to provide adequate care."[14] Ashley has been in DFS custody since the day after she was born in March 2003. She is well adjusted to her foster family where she lives with her half-brother. And, she has never met her biological father, Waters.

Because of the critical importance of the competing private and State interests in this case, the second factor—the risk of an erroneous deprivation of the parental interest through the termination procedures used and the additional burden created by utilizing the procedures advocated here—becomes pivotal. In assessing that risk, our analysis begins with the statute that requires DFS to offer reunification services to parents "whenever feasible."[15] In that context, we have held that the Family Court, in addition to finding a statutory basis for termination and concluding that termination is in the child's best interests, must also find that DFS has made "reasonable efforts" to reunite the family through written case plans or reunification services.[16]

Here, it is undisputed that DFS made *no* effort (let alone a reasonable effort) to unite Waters with his daughter. Instead, DFS denied all of his requests for visitation and sought to terminate his parental rights at a time DFS knew that Waters might be Ashley's father. The risk created by that procedure—of erroneously depriving Waters of his parental rights—was extremely, indeed impermissibly, high. Moreover, no showing was made that developing a case plan for Waters and attempting to reunify Ashley with Waters would have added any significant fiscal or administrative burdens.

The appellees respond that to attempt to reunify Ashley with Waters was not feasible, because: (i) he was incarcerated at the time paternity was established; (ii) once DFS formally moved for TPR it was no longer legally required to attempt reunification; and (iii) attempting to reunify Ashley and Waters after the Family Court had ruled that TPR was the permanent plan, would have contravened ASFA and FCCPR 216. None of these contentions has merit.

First, this is not a case where a parent's prolonged incarceration prevented DFS from working with that parent to establish a case plan involving reunification.[17] Although Waters was incarcerated at the time of the paternity determination, he was released less than thirty days thereafter. And although Waters was incarcerated during the last two days of trial, he was to be placed on work release the following month (April 2005) with no further probationary obligation.

Second, appellees' argument that DFS was no longer required to offer reunification once TPR proceedings began, misreads our holding in *In re Burns*.[18] In *Burns* we held that there is "no fundamental error in permitting the agency to discontinue reunification efforts if the State

---

14. *In re Hanks*, 553 A.2d 1171, 1177 (Del. 1989) (citing *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

15. 29 *Del. C.* § 9003(13).

16. *Arthur–Lawrence v. Div. of Fam. Serv.*, 884 A.2d 511, 2005 WL 2397523, at *5 (Del. Supr.); *In re Burns*, 519 A.2d at 647–48; *In re Hanks*, 553 A.2d at 1179.

17. For such a case, see *In re Heller*, 669 A.2d 25, 29 (Del.1995), where this Court affirmed a termination of a father's parental rights who never received reunification services because he faced four years of incarceration at the time the termination petition filing was filed.

18. 519 A.2d 638 (Del.1986).

has acted properly to terminate parental rights. In such circumstances the State assumes an adversarial role viś a viś the parents. To require continued reunification efforts, while contending for termination, is illogical."[19] We reversed the TPR order in *Burns*, however, because the State had not "exerted the required efforts to reunify" the parent and child. That is, in *Burns* the termination was invalidated because the State had failed to adhere to the minimum standards of due process, in that case, making a reasonable effort to reunify the child with his mother. In that respect, *Burns* is on all fours with this case, because here too the State made no effort to reunify Ashley with her father.

The appellees' final claim is that reunification was not "feasible" because it would violate ASFA and FCCPR 216. That argument also fails. Both ASFA and FCCPR 216 require the Family Court to conduct a permanency hearing no later than twelve months after a child has entered foster care.[20] That is all the statute and Rule relevantly mandated, and that is exactly what occurred. Nothing in the statute or the Family Court Rules cast the Family Court's approval of a permanency plan (TPR) in concrete or rendered that plan final and unalterable.[21] Indeed, the practice in TPR cases is instructive. Quite often, the *initial* plan is family reunification. Where it later becomes evident that the parents are unable to satisfy the requirements of that plan, the State then moves for TPR and the permanency goal changes to putting the child up for adoption.

Here, the State sought termination before it knew the father's identity. After the father's identity became known, the State persisted with its TPR plan, even though there was no clear and convincing evidence that reunification was not feasible and no provision of law precluded changing the initial permanency plan. To be sure, Ashley was entitled to a timely permanency decision, but in these circumstances that entitlement could not trump her father's due process right to a reasonable opportunity for reunification. Because DFS failed to provide Waters with any meaningful case plan or reunification services where they were feasible—and in this case required by statute—the State failed to comply with basic due process standards in termination of parental rights proceedings.[22]

■ A contrary conclusion could be justified only if the trial court correctly found that Waters had abandoned Ashley.[23] We conclude, however, that the record does not contain clear and convincing evidence that Waters intended to abandon his daughter. Under 13 *Del. C.* § 1103(d), where the basis for terminating parental rights is abandonment, DFS is not legally required to offer reunification services to the parent. To establish abandonment, the State must present clear and convincing evidence that for six months before the State filed the petition to terminate, the parent failed to communicate or visit regularly with the child, or failed to manifest an ability and willingness to assume legal and physical custody of that child.[24] No

19. *Id.* at 649.

20. 42 U.S.C. § 675(5)(c); *Hughes & Vernon v. DFS*, 836 A.2d 498, 505 (Del.2003).

21. Indeed, FCCPR 216(e) provides the explicit framework for a party to move to change the goal of a case plan.

22. *Burns,* 519 A.2d at 649.

23. 13 *Del. C.* § 1103(d).

24. 13 *Del. C.* § 1103(a)(2).

clear and convincing evidence establishes either of these two conditions for a finding of abandonment.

Given the inconsistent and contradictory statements by Mother and her husband to Waters regarding the identity of Ashley's father, the trial court's finding that Waters abandoned Ashley could not have been based on clear and convincing evidence. Nowhere do appellees explain how Waters could be faulted for not communicating with Ashley during the time when Waters did not know that he was her father. Nor is there clear and convincing evidence that, once paternity was known, Waters failed to manifest an ability and willingness to assume legal and physical custody. The undisputed evidence of record shows that as soon as Waters learned of the custody dispute and that he was Ashley's father, he repeatedly requested visitation with Ashley. Each time, however, DFS prevented Waters from initiating any relationship with his daughter. Given that record, the trial court's determination that Waters abandoned Ashley was factually erroneous and cannot stand.

### CONCLUSION

We reverse the judgment of the Family Court terminating Waters' parental rights in Ashley. The case is remanded to the Family Court for proceedings consistent with this Opinion.[25] Should a basis for termination of parental rights develop after that effort, DFS may then proceed accordingly.

25. On remand, DFS should be ordered to develop a plan for reunification.