COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

April 29, 2015

Marc S. Casarino, Esquire
Timothy S. Martin, Esquire
White and Williams LLP
824 N. Market Street, Suite 902
Wilmington, DE 19801

Samuel T. Hirzel, II, Esquire
Proctor Heyman Enerio LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

Re: *Hampton v. Turner*
C.A. No. 8963-VCN
Date Submitted: January 15, 2015

Dear Counsel:

Plaintiffs sought judicial dissolution of a company they founded, and the company responded by exercising an option to purchase Plaintiffs' units pursuant to its operating agreement. Defendants consequently moved for summary judgment. They argue that Plaintiffs lack standing to pursue dissolution because they are no longer members, and that the company properly paid the Plaintiffs the fair market value of their units. The action has evolved into a dispute about the purchase price to which Plaintiffs are entitled.

\* \* \* \* \*

Plaintiffs David Hampton, Sorin Brull, and Richard Szymke, along with Defendant Michael Turner (individually and as trustee of the Michael E. Turner Trust under Agreement dated June 15, 1978, "Turner"), founded Defendant T4Analytics LLC ("T4" or the "Company," and with Turner, the "Defendants") in July 2011.[1]  T4 is a Delaware limited liability company ("LLC") that primarily develops a medical technology invented by Hampton and Brull.  Turner, T4's Manager, Chair, and Chief Executive Officer, contributed $220,000 from the trust and has raised $829,000 from T4's other (non-founding) members.[2]  Hampton, Brull, and Szymke have not made any capital contributions, but each of the founding parties (including Turner) was given a 23.54% interest in T4.  As relevant to this action, the parties' relationship is governed by the Second Amended and Restated Limited Liability Agreement for T4Analytics LLC dated as of September 20, 2012 (the "Operating Agreement").[3]

---

[1] The facts are drawn from the Verified Complaint ("Compl."), T4's operating agreement, and exhibits to the parties' briefs.  There is no material dispute about the facts as they are presented herein.

[2] Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") Ex. B.

[3] Compl. Ex. C.

On October 1, 2013, Plaintiffs filed a complaint asking for T4's dissolution pursuant to 6 *Del. C.* § 18-801 by Plaintiffs' agreement or 6 *Del. C.* § 18-802 "on the grounds that it is not reasonably practicable to carry on the business in conformity with [the Company's] limited liability company agreement."[4]   In response, T4 expressed its intent to exercise its option to purchase Plaintiffs' units through a letter dated January 15, 2014.[5]   Section 5.3 of the Operating Agreement gives T4 a ninety-day option to purchase the units of a member who seeks dissolution under 6 *Del. C.* § 18-801 for the "Fair Market Value" of the member's units,[6] and Section 5.4 explains (in relevant part) that "Fair Market Value shall be

---

[4] Compl. ¶ 1 (alteration in original) (internal quotation marks omitted).
[5] Defs.' Mem. Ex. F.
[6] Section 5.3 of the Operating Agreement states:
> In the event a Member commences an action for dissolution of the Company under § 18-801 of the Act . . . , the Company shall, for a period of ninety (90) days after such an action . . . is served upon the Company, have the option to purchase such Member's Units by giving written notice to the Member of the exercise thereof.  The purchase price shall be equal to the Fair Market Value of the Units or, in the case of the Founding Members, the sum of Fair Market Value of the Vested Interest (as defined in the Buy/Sell Agreement) and Capital Price of the Unvested Interest (as defined in the Buy/Sell Agreement), if any, paid in accordance with the provisions of Section 5.4.  The Company may decline to close following exercise of this option at any time prior to the closing of the purchase.

determined by an appraiser . . . without taking into account any illiquidity or a

discount for a minority interest."[7]  Also relevant to the action is Section 4.3 of the

Operating Agreement addressing distributions—and particularly assigning priority

to the return of capital contributions through a payment "waterfall."[8]

---

Compl. Ex. C § 5.3.  To avoid a factual dispute for the purposes of this motion, Defendants assume that all of Plaintiffs' interests have vested. Defs.' Mem. 8 n.3.

[7] Compl. Ex. C § 5.4.1.

[8] In relevant part, the agreement provides as follows:

> 4.3  <u>Distributions</u>.  The Company shall make distributions to the Members from time to time in such amounts and at such times as is determined by the Manager . . . that the Company has sufficient cash in excess of the current and anticipated needs of the Company to fulfill its business purposes . . . .  All such distributions shall be made in the following order and priority:
>
> 4.3.1  First, to the Founding Members in proportion to, and to the extent of the excess of, their respective cumulative Preference Return (as hereinafter defined) through the date on which such distribution is made, over the sum of all prior distributions to such members pursuant to this <u>Section 4.3.1</u>;
>
> 4.3.2  Second, to the Founding Members, pro rata in proportion to and to the extent of their respective Net Capital Amount (as hereinafter defined);
>
> 4.3.3  Third, to the Members, pro rata in proportion to and to the extent of their respective Net Capital Amount (as hereinafter defined); and
>
> 4.3.4  Finally, to the Members pro rata in proportion to their respective Percentage Interest.
>
> 4.3.5  No distribution shall be declared or made if, after giving it effect, the Company would not be able to pay its debts as they become

The mutually selected appraiser, Gregory Urbanchuck ("Urbanchuck"), determined that T4 had a Fair Market Value of $1,886,000.[9] However, he explained that he could not make a final determination of the value of the Plaintiffs' units because of conflicting interpretations of the Operating Agreement.[10] In October 2014, T4 issued checks to each of the Plaintiffs based on a purchase price of $197,029.80, purporting to "close on its acquisition" of Plaintiffs' membership interests.[11]

---

> due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities.
> . . . .
> 4.3.7 "Preference Return" shall mean a 10% per annum cumulative return, compounded annually, on the average daily balance of each Founding Member's Net Capital Amount.
> 4.3.8 The "Net Capital Amount" of each Member shall equal the total amount of capital contributed to the Company by such Member, less any distributions to such Member pursuant to Sections 4.3.2 and 4.3.3.

*Id.* § 4.3.

[9] Defs.' Mem. Ex. K. Urbanchuck's letter explained that fair market value means "the price . . . at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market." *Id.* at 1 (internal quotation marks omitted).

[10] Defs.' Mem. Exs. I & J.

[11] Defs.' Mem. 8-10. Generally speaking, Defendants started with $1,886,000, subtracted $1,049,000 (representing the capital contributions of various members), and multiplied $837,000 (the difference) by 23.54%. *Id.* at 8. Defendants did not

* * * * *

Defendants have moved for summary judgment, asking the Court to dismiss Plaintiffs' complaint because (1) with T4's purchase of their units, Plaintiffs lack standing to seek dissolution, (2) Plaintiffs' complaint is moot now that they are no longer members, and (3) T4 paid Plaintiffs the appropriate price pursuant to Section 4.3 of the Operating Agreement—the only provision expressly addressing distributions. According to Defendants, failing to account for capital contributions and debts before compensating Plaintiffs would violate the parties' "basic business deal"[12] and result in a windfall for Plaintiffs with "no textual, legal or common sense basis."[13] They liken the valuation exercise to a "theoretical arms-length sale," adding that the price Plaintiffs received was more favorable than that to which they are otherwise entitled or could have earned through a sale.[14]

---

subtract out Turner's preferred return or certain debts. *See* Reply Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") 7-8. There is no dispute that the Operating Agreement allows T4 to buy all of Plaintiffs' units by paying twenty-five percent of the purchase price up front and issuing a promissory note for the remainder.

Although not critical to the Court's analysis, Plaintiffs have not cashed their checks. Pls.' Response in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") 5.

[12] Defs.' Reply 2.

[13] *Id.* at 9.

[14] *Id.* at 4.

Plaintiffs, on the other hand, contend that Section 5.4 requires a payment of 23.54% of $1,886,000 and, as such, T4 has not purchased their membership interests.[15] More specifically, Plaintiffs believe that they are entitled to a purchase price of $443,964.40 each because Section 4.3 applies to "distributions of excess cash" and to distributions upon dissolution—not the case here.[16] Rather, Section 5.3 refers to Section 5.4, which discusses fair market value without any minority or illiquidity discount.

* * * * *

A.  *The Summary Judgment Standard*

Pursuant to Court of Chancery Rule 56, the Court grants summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[17] The Court views the facts and makes

---

[15] Plaintiffs initially asked the Court to deny summary judgment because of the dispute over the purchase price and a possible dispute regarding whether Defendants drafted the Operating Agreement. At oral argument, Plaintiffs clarified their position that the proper price is a matter of contract interpretation that can be decided at law.

[16] Pls.' Opp'n 7-9.

[17] Ct. Ch. R. 56(c).

reasonable inferences "in the light most favorable to the non-moving party."[18] The meaning of a contract can be an appropriate subject for summary judgment if the contract is not ambiguous.[19]

B. *The Proper Purchase Price According to the Operating Agreement*

The primary dispute between the parties is whether T4 has properly exercised its purchase option by issuing each of the Plaintiffs a check based on his percentage of T4's value after applying the waterfall provision.[20] Both Plaintiffs and Defendants contend that the Operating Agreement is not ambiguous and that theirs is the correct reading.

---

[18] *Roncone v. Phoenix Payment Sys., Inc.*, 2014 WL 6735210, at *3 (Del. Ch. Nov. 26, 2014).

[19] *E.g.*, *2009 Caiola Family Trust v. PWA, LLC*, 2014 WL 1813174, at *7 (Del. Ch. Apr. 30, 2014).

[20] Technically, the analysis of standing and mootness should precede the merits analysis. However, the parties have agreed that the Court should interpret the Operating Agreement and have briefed the price issue thoroughly. Moreover, rendering an opinion on the purchase price would not result in an advisory opinion. *See Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) ("[S]tate courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions . . . ."). The Court addresses the procedural issues *infra*.

To interpret a contract, the Court first looks to the plain language as evidence of the parties' intent.[21] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[22] In reaching its conclusions, the Court takes a holistic view in attempt "to give effect to all of the contract terms and to reconcile or harmonize all of the contract's provisions."[23] The Court also avoids interpretations that produce absurd results to which the parties would not have agreed.[24] The Court can determine the "superior interpretation" as a matter of law,[25] and "[a]mbiguity does not exist simply because the parties disagree about what the contract means."[26]

Section 5.3 sets forth T4's right to acquire Plaintiffs' units and is an appropriate starting point. Read alone, the section talks about payment of "Fair

---

[21] *E.g.*, *Caiola Family Trust*, 2014 WL 1813174, at *7.

[22] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted).

[23] *Caiola Family Trust*, 2014 WL 1813174, at *7.

[24] *See Osborn*, 991 A.2d at 1160 n.21 (citing authority from other states).

[25] *Wills v. Morris, James, Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998).

[26] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). It is also true that the Court need not accept the parties' agreement that a contract is unambiguous. If there is more than one reasonable interpretation of the contract, the contract is ambiguous and the Court cannot grant summary judgment.

Market Value" and "Capital Price" to founding members like Plaintiffs. It also refers to Section 5.4 for more detail on payment. Section 5.4 defines Fair Market Value of the units as an amount (a) for which the Company has sold units in a recent arms-length transaction or (b) to be determined by an appraiser without a discount for illiquidity or a minority interest. This definition mentions neither pro rata division nor the waterfall, but an arms-length sale and an appraisal would seem to consider net assets, not capital contributions. Capital Price, as defined in the Founding Members' Buy/Sell Agreement, is not an issue at present because Defendants have made an assumption in favor of vesting to eliminate a factual issue.[27]

The Court's understanding of the parties' objective agreement becomes clearer upon looking at the contract as a whole. Defendants point to the waterfall provision in Section 4.3 as the only part of the contract to address distributions. Black's Law Dictionary defines "distribution" as "[t]he giving out or division

---

[27] Capital Price considers "the value of the cash contributions made by such Founding Member in respect of the purchase of such Units pursuant to the LLC Agreement." Compl. Ex. B § 4(a)(i). In other words, although the parties did not focus on this reasoning, Section 5.3 is not wholly silent on the issue of returning capital contributions.

among a number, sharing or parceling out, allotting, dispensing, apportioning."[28]

In that broad sense, Section 4.3 could apply to paying Plaintiffs anything (whether after a sale or a transaction based on a hypothetical sale). Yet, in the business context, it is not a foregone conclusion that paying to buy units back from a member is a distribution. Furthermore, Section 4.3 details distributions of excess cash "in such amounts and at such times as is determined by the Manager." The section expressly excludes compensation to members and assumes that T4 must maintain cash for business needs, including mandatory distributions.[29] The reference to excess cash is some evidence that Section 4.3 does not apply to buying Plaintiffs' units, but it is not dispositive. After all, Section 9.2 on dissolution specifically refers to the waterfall,[30] and there is no need to consider cash for continued operations upon winding up.

---

[28] *Black's Law Dictionary* 475 (6th ed. 1990).

[29] "Mandatory distributions" is not defined. Plaintiffs argue that payments to purchase their units would be mandatory distributions "even if Section 4.3 were applicable—which it is not." Pls.' Opp'n 8. The Court does not reach this alternative argument because of its conclusion that Section 4.3 does not apply.

[30] As Plaintiffs suggest, a provision on dissolution does not govern when T4 buys Plaintiffs' units to avoid dissolution and another part of the contract discusses that precise scenario. In other words, just because Plaintiffs asked for dissolution does not mean that Section 9.2, with its reference to Section 4.3, governs the pending dispute.

Confirming the interpretation that the waterfall does not apply is that the parties, whether intentionally or unintentionally, did not refer to Section 4.3 in Sections 5.3 and 5.4. Defendants cite *Auriga Capital Corp. v. Gatz Properties, LLC*[31] for the proposition that "in the context of a waterfall like §4.3 here, all capital should be returned before there are pro rata distributions,"[32] but nothing compels the Court to find that this case involves a distribution or that a waterfall provision always applies to distributions. In *Auriga*, the Court merely acknowledged the contractual provision relevant to a capital transaction or liquidation and accepted an expert's analysis (that "did not strictly follow the requirements of the distribution waterfall"[33]), "given [the defendants'] failure to challenge this aspect of [the expert's] analysis or the Minority Members' contention that none of them received cash distributions over the period of their investment."[34]

Defendants make a sympathetic argument that Section 4.3 represents the basic business deal of the parties. In their reply brief, they reason that it would not

---

[31] 40 A.3d 839 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012).
[32] Defs.' Mem. 13 n.6.
[33] *Auriga*, 40 A.3d at 879 n.168.
[34] *Id.*

make sense to do a simple multiplication exercise before returning capital contributions—for example, one member who contributed $250,000 to T4 would stand to receive only $33,194 (for its 1.76% interest) in a sale if Section 4.3 did not apply.[35] However, under the circumstances, Delaware law limits analysis to questions of (1) whether the contract's language is unambiguous and (2) whether applying its objective meaning would produce an unacceptable result. As above, the plain meaning of Sections 5.3 and 5.4, in the context of the overall Operating Agreement, is that T4 can buy Plaintiffs' units—to avoid dissolution—for their portion of T4's appraised value.[36]

Moreover, the result is not absurd or inequitable: Hampton and Brull invented the technology key to T4's business, the Operating Agreement distinguishes between founding members and other members, and Defendants played some role in drafting the contract.[37] When one contributes something of

---

[35] Defs.' Reply 5 n.2. It should be remembered that Plaintiffs are not arguing to apply their calculations in any other context than when T4 chooses to avoid dissolution pursuant to Section 5.3.

[36] The Court does not determine the propriety of the various assumptions Defendants made for the purposes of this motion (or provide the exact sum to which Plaintiffs are entitled) but anticipates that subsequent calculations will be performed in good faith.

[37] *See id.* at 5 n.1 (mentioning a joint drafting effort).

value to a business, she no longer fully owns that asset. If she wants it available upon terminating her relationship with that business, she should protect her rights in a contract. The parties knew how to address specific situations when they wanted the payment waterfall to apply, but they chose not to refer to the waterfall in describing the purchase option. In sum, the Court can find no reason to disrupt the objective language of the parties' agreement.

C. *Standing, Mootness, and Procedural Matters*

Plaintiffs originally filed this action to ask for dissolution of T4, and T4 purported to buy all of Plaintiffs' units pursuant to the Operating Agreement. Defendants, thus, argue that Plaintiffs no longer retain standing as "members" for the purposes of their request to dissolve T4. Broadly speaking, Delaware's Limited Liability Company Act (the "LLC Act"), under which Plaintiffs requested dissolution, allows dissolution of an LLC "upon the affirmative vote or written consent of the members"[38] or judicial dissolution "[o]n application by . . . a member . . . whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[39] As relevant to this

---

[38] 6 *Del. C.* § 18-801(a)(3).
[39] 6 *Del. C.* § 18-802.

action, the LLC Act defines a member as "a person who is admitted to a limited liability company as a member as provided in § 18-301,"[40] which in turn initially recognizes admission upon the LLC's formation, as provided in the LLC agreement, or as documented in the LLC's records.[41]

A litigant must have standing to initiate an action.[42] Furthermore, "[a] party must have continued standing throughout the pendency of the action to avoid an invocation of the mootness doctrine."[43] Under the mootness doctrine, the Court dismisses an action "if the alleged threatened injury no longer exists."[44] Delaware courts have found that plaintiffs lacked standing to demand inspection of company records[45] and to seek dissolution[46] of LLCs when they were not "members" as

---

[40] 6 *Del. C.* § 18-101(11).

[41] 6 *Del. C.* § 18-301(a).

[42] *E.g.*, *Gen. Motors Corp. v. New Castle Cnty.*, 701 A.2d 819, 823 (Del. 1997).

[43] *Id.* at 824.

[44] *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006).

[45] *See Prokupek v. Consumer Capital P'rs LLC*, 2014 WL 7452205, at *7 (Del. Ch. Dec. 30, 2014) ("While Plaintiff was recently a member of Smashburger and believes that he has a proper purpose in making his demand, these circumstances do not justify stretching the LLC Act's plain language in order to find standing.").

[46] *See R & R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *2 (Del. Ch. Aug. 19, 2008) ("The petitioners, however, are neither members nor managers of the [LLCs]. . . . There is no authority for the proposition

required by the LLC Act. In *Prokupek v. Consumer Capital Partners LLC*,[47] for example, the Court dismissed an action for inspection because the plaintiff's membership units had been redeemed according to the plain language of the LLC agreement. The LLC agreement allowed the company to redeem all of the units of a "Terminated Member" for fair market value as determined by the manager, provided for a specific closing date and method, left vesting decisions for certain units to the manager, and set forth a dispute resolution process.[48] After reviewing the terms of the LLC agreement and finding that the defendant's actions to redeem the plaintiff's units "were facially valid," the Court observed, "[T]hat damages might ultimately be forthcoming does not prevent the Court from concluding that [the plaintiff] was no longer a member of [the company] when he demanded inspection."[49]

In *Prokupek*, the plaintiff's units had been acquired and the debate was only about price. Here, in contrast, Defendants have asserted not only that the payment which they tendered was in the correct amount but that, if that amount was

---

that a member of an LLC which is itself a member of another LLC can seek dissolution or the winding up of the latter LLC.").

[47] 2014 WL 7452205.

[48] *Id.* at *4-5.

[49] *Id.* at *5.

incorrect, they should have the thirty days allowed by the agreement to decide whether to complete the purchase of Plaintiffs' units.[50] Thus, there is an issue, first squarely addressed in Defendants' reply brief, about whether Defendants are obligated to pay the purchase price pursuant to the Court's contract interpretation or if they should be able to choose whether to leave Plaintiffs with their units. The parties did not have a fair opportunity to address this issue as it was raised late in the briefing, and the Court is reluctant to weigh in.

Without resolution of this issue, there is unfortunate uncertainty. If the transaction is "completed," the Plaintiffs no longer own T4 units, but are entitled to payment of an amount significantly in excess of the amount previously tendered by T4. If the transaction is not "completed," and T4 has the choice of "restoring" Plaintiffs to their prior status as unit holders with standing to seek dissolution of T4, an entirely different course for the litigation seems likely. Yet another argument, advanced at one point by Plaintiffs, is that T4's failure to pay the proper amount in timely fashion results in its loss of any right to exercise an option or to close upon that option.[51]

---

[50] Defs.' Reply 10-11.
[51] *See* Pls.' Opp'n 13-14.

*Hampton v. Turner*
C.A. No. 8963-VCN
April 29, 2015
Page 18

These questions remain for the parties to address, but, at this point and for the reasons set forth above, Defendants' Motion for Summary Judgment must be denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K